[No. B188975. Second Dist., Div. Eight. June 19, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
KAHEAL JEVON PARRISH, Defendant and Appellant.

**COUNSEL**

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul M. Roadarmel, Jr., Joseph P. Lee and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RUBIN, J.**—Defendant and appellant Kaheal Jevon Parrish appeals from the judgment entered following a jury trial that resulted in his conviction of felony murder and two counts of attempted second degree robbery. He contends (1) he was denied the constitutional right of confrontation as a result of the admission into evidence of an accomplice's out-of-court statements and (2) the trial court abused its discretion in admitting expert testimony concerning gangs. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68]), the undisputed evidence adduced at trial, including defendant's own testimony and a surveillance tape

of the incident, established that, on February 4, 2004, defendant drove himself, Earl Childs and Zack Gaines to the Y & Y Market on 39th Street in Los Angeles. Knowing that Childs had a handgun concealed in his waistband, defendant entered the market with Childs while Gaines waited outside. Inside, employee Irma Balbuena was behind the counter talking to customer Percy Taylor, while owner Kazuyo Yoshida was in the back making lunch. After defendant and Childs walked around for awhile, Gaines came in and complained that they were taking too long. Whereupon, Childs pulled the handgun from his waistband, announced it was a robbery and told everyone to put their hands up and not move. As defendant complied with Childs's instructions to jump over the counter and search Balbuena, defendant noticed Yoshida pushing the alarm button. Defendant said, "She is calling the police," and jumped back over the counter. As he did so, defendant saw Taylor standing by the counter with his hands in the air; as he ran out of the store, defendant heard a boom and saw a flame. The surveillance videotape of the incident depicts Childs shooting Taylor as defendant is leaping over the counter; Taylor died from his gunshot wounds. Meanwhile, defendant, Childs and Gaines returned to defendant's car, which defendant drove onto the southbound 110 Freeway.

Defendant, Childs and Gaines were charged with the attempted robberies of Yoshida and Balbuena and Taylor's murder. Personal gun use enhancements were alleged against Childs and an armed principal enhancement was alleged as to all three defendants.[1]

Defendant was the first of the three to be tried in separate trials. His theory of defense was that, although a former gang member, defendant was no longer involved in the gang and had been coerced into participating in the robbery; defendant believed failure to comply would result in harm to himself or his family because defendant had already been severely beaten once for being a "snitch." Defendant explained that, while in the California Youth Authority (CYA) in 2001, he was called upon to testify against another gang member charged with murder. Although defendant refused to do so, he learned that his gang had nevertheless labeled him a "snitch" for cooperating with the police and had issued a "green light" on him.

After he was paroled from CYA, defendant moved out of South Central Los Angeles first to Palmdale and then to Moreno Valley; he got a class-A

---

[1] Prior conviction enhancements pursuant to the "Three Strikes" law also were alleged, but the prosecution subsequently struck those allegations. Defendant waived a penalty trial in exchange for a promise that the prosecution would not seek the death penalty.

commercial driver's license and a well-paying job as a cross-country truck driver with U.S. Express; he worked seven days a week, essentially living on the road; when in town, he reported regularly to his parole officer and underwent drug testing. He came to Los Angeles infrequently to see friends and family, usually just for the day.

While in Los Angeles to see his girlfriend on March 21, 2002, defendant was driving with his cousin in the area claimed by his former gang, although he knew that doing so was a violation of his parole. When gang members saw defendant, they dragged him from the car, told him he was "not allowed over here anymore," and beat him so severely that he had to be hospitalized. Defendant did not identify his assailants to police because he was afraid to do so would result in his being killed by the gang.

On February 1, 2004, defendant was in Los Angeles for the birth of his son. Two days later, on February 3, 2004, he planned to bring his girlfriend and son home from the hospital. Gaines, a childhood friend of defendant, said he wanted to see defendant's son. Since defendant needed to stop for diapers, he arranged to meet Gaines at the Y & Y Market. While his girlfriend waited in the car with the baby, defendant went into the market with Gaines.[2]

The next morning, defendant had car trouble and drove his car to an auto repair shop where he waited several hours for the necessary repairs to be completed. As defendant was leaving the shop in his car, Childs and two other Black males stopped him, mentioned the "green light," and threatened to kill defendant, his girlfriend and son if defendant did not comply with their demands. Childs pointed a gun at defendant and said: "This is what we coming to do. We come to take this car, and you going to take us to where we need to go."

Almost immediately after Childs spoke into a cell phone, a gray car pulled up; Gaines got out of the front passenger seat of that car and into the front passenger seat of defendant's car while Childs got into the backseat behind defendant. Childs's other two companions got into the gray car. Obeying Childs's commands, defendant followed the gray car to the area where the Y & Y Market was located and parked. Childs told defendant: "You got to go in there, play like you buying something from the store. Look around. Ask questions. Listen to what I tell you and follow the directions. If you don't follow everything I tell you to do, then we are going to kill you." Gaines

---

[2] Yoshida testified that defendant and another male came into the store on February 3, 2004; they tried to buy cigarettes but, because they had no identification, she refused to make the sale. The event was recorded on the store's video surveillance camera and the tape was shown to the jury. Because Yoshida did not say anything about diapers, the implication was that defendant and Gaines were reconnoitering for the next day's robbery.

waited at the door while defendant and Childs went into the market and walked around. After awhile, Gaines came in and said to Childs, "Hurry up. This is taking too long." While defendant was asking Balbuena about diapers for newborns, he saw Childs pull the gun out of his waistband. Childs announced, "This is a robbery. Nobody move. Put your hands up." Aiming the gun at Taylor, Childs instructed defendant to jump over the counter and search Balbuena. As defendant did so, he saw Yoshida pushing the alarm button. Defendant said, "she is calling the police," then jumped back over the counter; when defendant heard a "boom" and saw a flame, he thought Childs had shot him but he kept running. Back at defendant's car, defendant got into the driver's seat, Childs got into the seat behind defendant, and Gaines got into the front passenger seat; when an undercover police car turned the corner, Childs and Gaines ducked down and Childs told defendant to wait; when the police car passed, Childs told defendant to go. As defendant drove away, a number of Hispanics ran in front of the car but defendant kept going. At Childs's instruction, defendant entered the southbound 110 Freeway, which he exited at Florence. Before Childs and Gaines got out of the car and boarded a bus, Childs warned defendant that, if defendant turned himself in, Childs would kill defendant and his family. Defendant testified that he did not go to the police because he believed that the gang would kill him and his family if he did so, and he did not believe the police could protect him.

A psychologist, Adrienne Davis, opined that defendant was not a willing participant in the offense; defendant's fear of being killed was reasonable in light of his life experiences, including the beating he received in connection with the accusation that he was a "snitch."

Detective Salaam Abdul, lead investigating officer on the case, testified that, when he interviewed Childs in connection with the incident, Childs said that, in addition to the gun Childs used during the robbery murder, Gaines also was armed with a .380-caliber handgun which defendant had given him.

Roza Moscovian met defendant at a gas station in Palmdale in January 2004, several weeks before the robbery. At the time, defendant was with Gaines. Moscovian saw defendant four or five times after that first meeting. On one such occasion, Moscovian saw a gun on the console between the seats of defendant's gold car. Defendant used the word "Cuz" in conversation and, at some point, Moscovian learned from either Gaines or defendant that defendant was a member of the Crips gang.

The jury convicted defendant on all counts, finding true the allegations that the murder was committed during a felony and that a principal was armed with a handgun. The trial court denied defendant's motion to strike the special circumstance finding and sentenced him to life in prison without the

possibility of parole for the murder; sentence on the two attempted robbery counts was imposed but stayed pursuant to Penal Code section 654.

Defendant filed a timely notice of appeal.

## DISCUSSION

### 1. *Childs's Statements to Detective Abdul Were Admissible*

Defendant contends that, under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*) and *Lilly v. Virginia* (1999) 527 U.S. 116 [144 L.Ed.2d 117, 119 S.Ct. 1887] (*Lilly*), he was denied due process as a result of the trial court's admission into evidence of Childs's statement to police that defendant always carried a .380-caliber handgun and that defendant gave this gun to Gaines before the robbery. Relying on Evidence Code section 356 (section 356), the People counter that defendant forfeited the right to challenge these statements by introducing into evidence other statements made by Childs during the same interview. Section 356 provides in part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."[3] We agree with the People.

#### a. *The evidence proffered by defendant*

During an interview, suspect Childs made the following statements to Detective Abdul, which *defendant* sought to introduce into evidence to corroborate his theory that he was coerced into participating in the robbery:

—Childs knew that "everybody was trying to kill [defendant] because [defendant] was a snitch."

—Defendant was "already scared and shit."

---

[3] Section 356 is sometimes referred to as the statutory version of the common law rule of completeness. (See, e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 130 [30 Cal.Rptr.3d 105, 113 P.3d 1125].) According to the common law rule: " '[T]he opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance.' [Citation.]" (*Beech Aircraft Corp. v. Rainey* (1988) 488 U.S. 153, 171 [102 L.Ed.2d 445, 109 S.Ct. 439] (*Beech*).)

—"[T]hey was like we need a car. Well—it was a matter of fact that we were going to use Blue Devil car. He like 'man, that's all I got.' They was like, 'we don't care.' [Defendant] didn't want to use his car, but put pressure.' "

—"[Defendant] can't live in the city because people want to get him still."

—"[Defendant] has a worst enemy, he want to kill him. He want to kill [defendant.]"

—Defendant "was snitching, they had paperwork, like they had informant paperwork, like cases and who said what, and [defendant] was a witness."

 b. *The Evidence Code section 402 hearing*

At a hearing pursuant to Evidence Code section 402, defendant argued that Childs's out-of-court statements to Detective Abdul were admissible, not for the truth of the matter asserted—i.e., whether there was a "green light" on defendant and whether there was anyone that wanted to kill defendant—but for the nonhearsay purpose of corroborating defendant's testimony that he believed he would be killed if he refused to participate in the robbery. Defense counsel argued: "[T]o the extent that [the prosecution's] theory is that Mr. Childs and [defendant] were acting together, it makes no sense and sort of undermines that theory by allowing these statements in support of our duress defense in that [Childs] put pressure on [defendant]; that [defendant] didn't want to have his car used; that [defendant] was scared, and that [defendant] already had a hit on him. [¶] If they already had a hit on him and knew he was a snitch, it sort of undermines the prosecution's theory that they were both working in cahoots, if you will, and be part of a common plan if his own gang, former gang, had a hit on him. [¶] And that's the non-hearsay purpose."

The prosecution countered that, if defendant introduced this evidence, the prosecution should be allowed to rebut the inference of duress by introducing into evidence other statements made by Childs during the same interview with Detective Abdul. Defense counsel disagreed, arguing that, whereas Childs's statements proffered by defendant were admissible for a nonhearsay purpose, those proffered by the prosecution were inadmissible under *Crawford.*

The trial court observed: "The thing is, you're not going to have it both ways . . . I'll tell you right now, you're not going to be able to pick and choose what you want and stand in front of *Crawford* to avoid other parts

coming in. So you're going to have to make your decision." It continued: "If you want me to follow [*Crawford*], then you're not going to be able to create a situation where you just create and display half truths basically to the jury. The answer is no, that is not going to happen." Defense counsel clarified: "[T]he only way the court will allow the five statements [defendant proposes to introduce] is to [allow the prosecutor to introduce certain additional statements]? [¶] THE COURT: Right."[4]

### c. *The challenged evidence*

Over defendant's objection, the trial court allowed the prosecution to elicit Detective Abdul's testimony that, during the same interview, Childs made the following statements:

—" 'I like fuck it because I only want to push—[defendant] always have like a .380 in his little glove compartment. So he gave that to [Gaines] and shit. I'm like man, I don't want to get in on my nigger. And when we got there we—we—we were bullshitting, you know what I'm saying. [¶] We was already walking around the store for a long time because I—I wasn't going to pull it. I wasn't going to do it, you know what I'm saying.' "

—In response to Detective Abdul's inquiry, " 'You said he gave the .380 to [Gaines], but you had the gun?' " Childs said, " 'Two gun.' "

—Referring to the surveillance video of the robbery, Detective Abdul said they only saw one gun, to which Childs replied, " 'Yeah, it was two guns.' "

—In response to Detective Abdul's repeated inquiry, Childs confirmed that Gaines had the second gun, and had obtained this second gun from defendant.

### d. Crawford *does not abrogate section 356*

Defendant argues that, notwithstanding section 356, the challenged evidence was inadmissible under *Crawford*. In *Crawford*, the United States Supreme Court held that the confrontation clause of the federal Constitution bars the admission of out-of-court "testimonial" statements except when the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford, supra*, 541 U.S. at pp. 53–54.) The court

---

[4] Although the trial judge did not expressly mention section 356, it is clear from the "both ways" colloquy that the court had the Evidence Code section in mind. In any event, we uphold a judgment if it is correct for any reason regardless of the correctness of its grounds. " ' "It is judicial action and not judicial reasoning which is the subject of review . . . ." ' [Citation.]" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1119, fn. 4 [60 Cal.Rptr.2d 277, 929 P.2d 596].)

overruled the former rule, announced in *Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531], that hearsay statements of unavailable witnesses were admissible without violating the confrontation clause if those statements fell within a firmly rooted hearsay exception or contained particularized guarantees of trustworthiness.

However, *Crawford* did not renounce all exceptions to the confrontation clause, only those that replace the constitutionally prescribed method of assessing reliability—cross-examination—with a judicial determination of reliability: "In this respect, [the *Roberts* test] is very different from exceptions to the Confrontation Clause that make no claim to be a surrogate means of assessing reliability. For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. [Citation.]" (*Crawford, supra,* 541 U.S. at p. 62.) Under the forfeiture by wrongdoing rule, "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. (Fed. Rules Evid., rule 804(b)(6), 28 U.S.C.; see *People v. Giles* (2007) 40 Cal.4th 833, 839 [55 Cal.Rptr.3d 133, 152 P.3d 433] (*Giles*).) In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266, 2280], the high court reaffirmed: "We reiterate what we said in *Crawford*: that 'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.' [Citations.] That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." The forfeiture rule is not founded on the reliability of the admitted hearsay.

Recently in *Giles*, our Supreme Court held that the forfeiture by wrongdoing rule applied in California and that evidence received pursuant to that hearsay exception was not barred by *Crawford*. The court affirmed a murder conviction in which the trial court admitted testimony of the victim's statement to a police officer about a prior incident of domestic violence. "Although *Crawford* dramatically departed from prior confrontation clause case law, it renounced only those exceptions to the confrontation clause that purported to assess the reliability of testimony. [Citation.] The court noted that forfeiture by wrongdoing, an equitable principle, remains a valid exception to the confrontation clause . . . ." (*Giles, supra,* 40 Cal.4th at p. 840.)

█ We conclude, by analogy to the rule of forfeiture by wrongdoing, that statements otherwise admissible under section 356 are generally not made inadmissible by *Crawford*. This is because, like forfeiture by wrongdoing, section 356 is not an exception to the hearsay rule that purports to assess the reliability of testimony. The statute is founded on the equitable notion that a

party who elects to introduce a part of a conversation is precluded from objecting on confrontation clause grounds to introduction by the opposing party of other parts of the conversation which are necessary to make the entirety of the conversation understood. Section 356 is founded not on reliability but on fairness so that one party may not use "selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see also *People v. Samuels, supra*, 36 Cal.4th at p. 130 [same].) As *Crawford* forbids only the admissibility of evidence under statutes purporting to substitute another method for confrontation clause test of reliability, evidence admissible under section 356 does not offend *Crawford.*

Although no California court has addressed this issue, decisions from other jurisdictions support our conclusion that *Crawford* has not abrogated section 356 and the rule of completeness. For example rule 106 of the Federal Rules of Evidence (28 U.S.C.), which partially codifies the common law rule of completeness (*Beech, supra*, 488 U.S. at p. 171), provides: " 'When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.' " In *U. S. v. Moussaoui* (2004) 382 F.3d 453, the defendant argued that, under *Crawford*, the government was precluded from introducing inculpatory portions of a witness's statement to counter exculpatory portions of the same witness's statement introduced by the defendant because to do so violated the defendant's constitutional right of confrontation. The Fourth Circuit disagreed, holding that such evidence was admissible under the rule of completeness and rule 106, so long as the statements introduced by the government explained or clarified the statements introduced by the defendant. (382 F.3d at p. 481.)

Rule 106 of the Arizona Rules of Evidence is identical to the federal rule. In *State v. Prasertphong* (2005) 210 Ariz. 496 [114 P.3d 828], the Arizona Supreme Court concluded that admission of a codefendant's entire statement did not raise confrontation clause problems because the defendant "forfeited his Confrontation Clause right not to have [the codefendant's] entire statement admitted against him when he made the tactical decision to introduce portions of the statement that, standing alone, had the serious potential to mislead the jury." (*State v Prasertphong*, at p. 833; see also *State v. Ellison* (2006) 213 Ariz. 116, 130 [140 P.3d 899].) Holding that *Crawford* did not affect the constitutionality of Arizona's rule 106, the court in *Prasertphong* reasoned that the evidentiary rule "is similar to the rule of forfeiture in that it does not purport to be an alternative means of determining reliability. Rather, the rule of completeness, like the rule of forfeiture, 'extinguishes confrontation claims essentially on equitable grounds.' Rule 106 does not permit

admission of the remaining portion of a statement because that remaining portion is reliable but rather because it would be unfair to mislead the jury by admitting the redacted portion, particularly when a defendant chooses to introduce the portion of the statement or writing that the trial court has found to be incomplete and thus misleading to the jury." (*State v. Prasertphong, supra,* at p. 834.) In other words, reliability of the evidence is not a factor in determining admissibility under the rule of completeness—indeed, the evidence proffered by the defendant and the prosecution may both be unreliable.

We turn now to whether the evidence was properly received under section 356.

### e. *Admissibility under section 356*

A trial court's determination of whether evidence is admissible under section 356 is reviewed for abuse of discretion. (See *People v. Pride* (1992) 3 Cal.4th 195, 235 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

█ " ' "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry. 'In the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon, or connection with,* the admission or declaration in evidence. . . . [Citation.]" ' [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 334–335 [33 Cal.Rptr.3d 509, 118 P.3d 545] (*Harris*).)

In *Harris,* the defendant maintained that he and the attempted-murder victim were in business together selling drugs and gave an account of being shot at by strangers when he went to the victim's home to do a drug deal. Because the victim was unavailable for trial (he was later murdered in an unrelated incident), his preliminary hearing testimony was entered into evidence. The evidence included the victim's denial that he was a "loan shark" and his description of himself as a businessman. The defendant impeached the victim's denial with evidence that, during a telephonic interview with an investigating officer after the attempted murder, the victim admitted he was a loan shark. Our Supreme Court held that the prosecution was entitled to present the entire context in which the victim made the admission that he was a loan shark, including the victim's explanation of the shooting, which he asserted arose out of his loaning money to the defendant, not a drug deal. "The statements were admissible for the nonhearsay purpose of placing [the victim's] statements into context. [Citation.]" (*Harris, supra,* 37 Cal.4th at p. 335.)

In *People v. Harrison* (2005) 35 Cal.4th 208 [25 Cal.Rptr.3d 224, 106 P.3d 895], the defendant elicited a police officer's testimony that one Johnson told the officer that he was present when the defendant was negotiating with one of the murder victims about buying crack cocaine and when the defendant killed both victims. Over the defendant's objection, the prosecution elicited the officer's testimony about the additional details Johnson gave of the murders. Our Supreme Court affirmed, reasoning: "[O]nce defendant had introduced a portion of Johnson's interview with [the police officer] into evidence, the prosecution was entitled to introduce the remainder of Johnson's interview to place in context the isolated statements of Johnson related by [the officer] on direct examination by the defense. [Citation.]" (*Id.* at p. 239.)[5]

In *People v. Wharton* (1991) 53 Cal.3d 522, 592–593 [280 Cal.Rptr. 631, 809 P.2d 290], the defendant elicited evidence from a police officer that the defendant showed contrition by confessing to a previous murder. Over the defendant's objection, the prosecutor introduced evidence of the details of that confession. The appellate court held that the evidence elicited by the prosecution was admissible under section 356, reasoning that the "defendant presented evidence from which the jury could infer that his moral culpability for that crime was somewhat reduced. On redirect, the prosecutor was entitled to rebut that inference with evidence of the entire conversation, revealing that the defendant's admission of guilt was not an admirable expression of remorse but was instead made under circumstances showing a false and morally objectionable sense of personal justification." (*Wharton*, at pp. 592–593.)

Here, it is undisputed that Childs's statements to Detective Abdul were "testimonial" in nature. (*Crawford, supra*, 541 U.S. at p. 52 [statements taken by police officers in the course of interrogations are testimonial].) Accordingly, under *Crawford*, those statements were inadmissible unless they came within an exception to the confrontation clause that does not purport to be a surrogate means of assessing reliability. The trial court found the statements were admissible to put in context other statements introduced into evidence by defendant; in other words, under section 356. We find no abuse of discretion in that determination.

For purposes of section 356 analysis, the "subject" of the evidence proffered by defendant was whether defendant was coerced into participating in the robbery. The defense offered Childs's statements that the gang believed

---

[5] The trial in *Harrison* preceded the *Crawford* decision. Although our Supreme Court discussed whether *Crawford* was retroactive and whether any error was harmless, it did not expressly address the relationship between *Crawford* and section 356. (*People v. Harrison, supra*, 35 Cal.4th at pp. 238–240.)

defendant was a "snitch," some gang members wanted to kill defendant, defendant was frightened and defendant did not want to use his car in the robbery but he was pressured to do so. From this testimony, the trier of fact could reasonably infer that defendant's participation was coerced. Under section 356, if Childs made other statements during the interview from which a contrary inference could be drawn, i.e., that defendant participated in the robbery willingly, those other statements are admissible because they are relevant to the subject of whether defendant's participation in the robbery was willing or unwilling. Childs's statement that defendant was in possession of a handgun which he gave to Gaines to use in the robbery satisfies this condition because it suggests that defendant was a willing participant in the robbery.

■ Because the statements proffered by defendant, when viewed in isolation, presented a misleading picture of the entirety of Childs's interview, and the evidence proffered by the prosecution served to put those statements in context, the prosecution's proffered evidence had " ' " '*some bearing upon, or connection with*' " ' " the statements introduced into evidence by defendant. (*Harris, supra,* 37 Cal.4th at pp. 334–335.) As such the evidence proffered by the prosecution was admissible under section 356.

### f. The challenged evidence was not inadmissible under Lilly

For the same reason that his *Crawford* argument fails, so does defendant's contention that the prosecution's proffered evidence was inadmissible under *Lilly*.

■ The issue in *Lilly* was whether an accused's rights under the confrontation clause are violated by the admission into evidence of an accomplice's out-of-court confession that also contained statements that inculpate the accused. The United States Supreme Court held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence. [Fn. omitted.]" (*Lilly, supra,* 527 U.S. at p. 134.)

Like *Crawford*, *Lilly* is inapposite because, by electing to introduce into evidence part of Childs's conversation with Detective Abdul, defendant forfeited the right to object on confrontation clause grounds to introduction of other parts of the conversation by the prosecutor. The fact that the declarant is an accomplice is beside the point. If defendant wishes to rely on the accomplice's confession, he should not be allowed to pick and choose the favorable from the unfavorable.

## 2. Gang Evidence

Defendant contends the trial court abused its discretion in admitting the gang expert testimony of Los Angeles Police Officer Jason Delacova. As we understand defendant's argument, it is that the sole issue at trial was whether defendant possessed the requisite mental state to commit the charged offenses—i.e., whether he participated in the robbery willingly or under duress—and evidence of gang hierarchy, turf, cliques, other crimes and tattoos was not relevant to this issue. According to defendant: "The prosecution's case . . . depended on the jury finding [defendant] was still an active gang member in the face of uncontested and corroborated evidence [defendant] had been severely beaten with a baseball bat by the gang, that he moved out of the area, that he had materially changed his lifestyle and had acquired a trade and regular employment." Alternatively, defendant contends the gang evidence constituted "impermissible profile evidence." We disagree.

### a. The Evidence Code section 402 ruling

Defendant sought to exclude Delacova's testimony on the grounds that it was irrelevant to any issue in the case, speculative as to defendant's motive in committing the robbery, and more prejudicial than probative under Evidence Code section 352 inasmuch as there was no Penal Code section 186.22 gang enhancement alleged. The trial court concluded that the evidence was admissible, noting: "You opened the door with your duress defense which I allowed you to fully present to the jury. The People are entitled to rebut that. Your client talked about the green light situation, you talked about—you brought all the information about what it is to be a snitch and all of that . . . . You can't have your cake and eat it too. You presented your defense, they're allowed to present evidence to rebut it."

### b. The challenged evidence

Delacova testified that between March 2003 and December 2004 he was assigned to the Southwest Division Gang Enforcement Detail; his area of expertise was the "Rollin' 30's," which is a faction of the Crips gang. Known as cliques, these factions are usually delineated by where the gang members live; for example, most members of the Rollin' 30's clique live between 30th and 39th Streets, and the territory or "turf" they claim is bordered by Normandie on the east, Arlington on the west, Martin Luther King to the south and Jefferson to the north. Within the Rollin' 30's are three distinct cliques derived from where the members of each of those cliques live: (1) 39th Street; (2) Denker Park; and (3) Avenues.

To gangs, "turf" is important and members work to acquire more territory in order to gain more power; gangs do not allow rival gang members into

their territory. In addition to an overall rivalry with the Bloods gang, individual factions within the Crips also consider themselves rivals with one another.

The crimes committed by the Rollin' 30's range from vandalism associated with marking their territory, to selling drugs, robberies, drive-by shootings, and murders. Anyone in the gang may have a gang-related tattoo; tattoos signify loyalty to the gang; it is unlikely that a nongang member will have a gang tattoo.

Delacova opined that cooperating with law enforcement was the worst thing a gang member could do. But, he explained, there were different levels of punishment for different levels of cooperation. For example, a gang member who gave information to law enforcement but then refused to testify might be beaten by the gang as punishment—Delacova termed such a beating a "disciplinary action." But if a gang member is perceived as having done something more than just provide information to the police, he may be made subject of a "green light," which, Delacova explained, is authorization from authority figures in the gang to kill that person. A member who has been "green lighted" will stay out of his former gang's territory because to do otherwise would risk death. And a gang member who has been "green lighted" for cooperating with law enforcement would not be asked to participate in a crime on behalf of the gang because the gang would know that he could not be trusted. By contrast, a gang member who has been the subject of a "disciplinary action" would want to prove that he had learned his lesson about not cooperating with law enforcement and show his continued loyalty to the gang by committing a crime on its behalf.

It was Delacova's opinion that the March 2002 assault on defendant, which occurred in Rollin' 30's territory, was a "disciplinary action" intended to punish defendant for cooperating with the police, albeit recognizing his refusal to testify.[6]

Regarding the surveillance videos of defendant's visit to the market the day before the robbery and the robbery itself, Delacova stated that Childs seemed to be the leader: "[W]hat I saw was an organized group of guys that went into a liquor store and committed a robbery. In this instance it looks like it was planned out. It looked like, umm, they knew what they were doing before they even went in there, who was going to be doing what on the video. And the fact that they went in there a day before on the video, what I would—my opinion would be that that was to case the joint, case the place to

---

[6] Although the testimony was at odds with Childs's admission to the police, the jury was free to believe either version.

see what was involved when they went in there the following day." Delacova testified that it was "beyond coincidence" that the market would be robbed by defendant and Gaines the day after they were there.

### c. *Conclusion*

The defense theory was that the only reasonable inference from the evidence that defendant had been severely beaten by the gang for cooperating with law enforcement was that defendant had abandoned the gang but was coerced into participating in the robbery. This defense put into issue whether defendant's motive in committing the robbery was to avoid further injury to himself or his family. Accordingly, evidence from which it could be inferred that defendant had some other motive to participate in the robbery—i.e., that he participated in the robbery willingly—was relevant. Delacova's testimony was thus admissible for the following reasons:

—Gang hierarchy—relevant to show that defendant's motive in participating in the robbery was not to avoid injury, but to renew and improve his position in the gang after having cooperated with law enforcement.

—Turf—defendant testified that, immediately before the March 2002 beating, one of defendant's assailants said, "You not allowed over here anymore. Didn't we tell you mother-fucker, you not allowed over here anymore?" This, suggests that defendant was being punished for returning to Rollin' 30's "turf." Nevertheless, defendant returned to the area. Accordingly, the attitude of the gang to turf was relevant.

—Cliques—the relationship among the various cliques within the Crips and the Rollin' 30's was relevant as general background information to explain defendant's position in the gang.

—Criminal Activity—the kinds of crimes committed by the Rollin' 30's was relevant background information.

—Tattoos—that gang tattoos signified loyalty to the gang was relevant to show the level of defendant's commitment to the gang signified by his tattoos.

Since defendant's gang membership was introduced by defendant, and Delacova's expert testimony was relevant to counter defendant's inferences and was not improper profile evidence, the trial court properly admitted the evidence.

## DISPOSITION

The judgment is affirmed.

Cooper, P. J., and Boland, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 25, 2007, S154304.