Filed 3/17/14  P. v. Adams CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047855 |
| v. | (Super. Ct. No. 11ZF0112) |
| DEREK CHRISTOPHER ADAMS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Derek Christopher Adams was found guilty of second degree murder (Pen. Code, § 187, subd. (a))[1]; grand theft (§§ 484, 487); assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)); and first degree burglary (§§ 459, 460). The jury found true that in the commission of the murder, defendant personally discharged a firearm causing great bodily injury and death within the meaning of section 12022.53, subdivision (d), and found true that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a). Defendant was sentenced to 46 years to life in state prison, consisting of a determinate upper term of 6 years for burglary, a consecutive indeterminate term of 15 years to life for the murder, and a consecutive term of 25 years to life for the firearm enhancements. The court stayed the sentence on the other convictions under section 654.

Defendant raises a single issue on appeal. He contends the court erroneously excluded evidence of statements he made when officers initially apprehended him after his flight. He contends his statements should have been admitted under Evidence Code section 356, the rule of completeness, because his statements help explain his flight as something other than consciousness of guilt. We affirm.

### FACTS

This case arose out of a lover's triangle consisting of defendant, Lauren Schneider, and Marissa Bilotti. Defendant and Schneider had been dating for three years and living together. They broke up in or around January 2010, but the break up was incomplete. They maintained an intermittent social and sexual relationship. At the same time, defendant was in a relationship with Bilotti.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

On the morning of October 22, 2010, defendant was at his house in Huntington Beach, and Schneider was with Cody Mosher's at his house in Newport Beach. Defendant and Mosher had not met, but defendant was aware that Schneider was at Mosher's house. At 8:40 a.m., defendant sent Schneider the following text message: "I'm driving to Newport. I'm going to beat the fuck out of both of you." At 10:20 a.m., defendant sent a friend a text, "She's slamming dope with some Cody kid. Now she has hep C. I'm gonna go beat the fuck outta both of them . . . ." Defendant sent another message to the same friend that said, "I'm going upstate on the 27th, so I'm just gonna go out with a bang." Defendant also sent a text message to Schneider that read, "Hep 2." "You nasty bitch." Defendant also texted Bilotti a message that said, "I need your backup."

Defendant and Bilotti drove to Mosher's house. They entered by kicking in the front door. Defendant beat Mosher with his fists and kicks and inflicted a nonfatal puncture wound in Mosher's chest with a knife. Defendant found Schneider in the bedroom and started calling her a "fucking bitch" and a "fucking cunt." Defendant then hit her in the head with a closed fist numerous times. Defendant also shoved her and put a knife to her throat. He took Mosher's blue cell phone, and took money from Schneider's purse. Defendant and Bilotti then left the scene.

Schneider called her friend Terri Garret at 11:30 a.m. Schneider and Mosher drove to Garret's home in Garden Grove. Garrett's husband, Gregory Heintz, was at some time in the past a member of PEN1, a white supremacist gang known for murder, burglary, robbery, and narcotics sales. Schneider and Mosher told Heintz what defendant had just done to them. Garrett was upset by what had happened to Schneider, and although Heintz did not know Mosher or defendant, Heintz was upset because Garrett was upset.

Mosher and Schneider wanted to recover Mosher's cell phone and Schneider's money. They used Schneider's cell phone to send messages to Mosher's cell

3

phone, which was in defendant's possession, at 1:51, 1:52, 2:31, and 2:34 p.m. The text sent at 2:34 p.m., from Mosher, said, "Out of respect, just give me my phone. I understand why you did what you did. Just give me my phone back. I'll leave Lauren alone." At 2:39 p.m., defendant replied, "You're a bitch. I don't want your phone. You called me out, got handled, now you got to bring backup." Mosher was convinced he was not going to get his phone back, and left to his sister's house to sleep. Defendant later told Schneider on the phone, "come get your money, bitch," and said that he was at Murdy Park.

Bilotti drove to pick up defendant. When she picked him up, defendant was wearing a big hooded sweatshirt and was hiding something in the pouch of the sweatshirt. When defendant got into the car, he was carrying a gun. After she dropped him off at the park, Bilotti parked her car nearby with a towel covering her license plate.

Schneider, Heintz, Garrett, and Garrett's friend Nicole arrived at the Murdy Park parking lot in Nicole's SUV around 3:00 p.m. Heintz was unarmed. Defendant was waiting. The presence of two empty cigarette packs and numerous cigarette butts on the ground where he was standing suggested he had been there for a while. Defendant had Mosher's blue cell phone with him.

Heintz got out of the SUV. Defendant and Heintz approached each other. They walked side by side a distance of about 30 feet. They were arguing the whole time. One witness said they were "screaming and yelling at each other and making a very huge scene."

Defendant then turned to Heintz and shot him in the stomach at close range with the revolver. Heintz grabbed his stomach with both hands and dropped to the ground.

Defendant ran away with the gun. Bilotti picked him up, removed the rag from her license plate, and drove away.

4

Officers arrived quickly.  A witness who had seen the car driving away memorized the license plate number, instructed another person to write it down on his hand, and the other person gave that information to the officers who arrived at the scene. An officer located Bilotti's vehicle a few blocks from the park shortly thereafter.  He turned on his siren and lights and attempted to stop it. The car did not pull over, but eventually stopped when it got stuck in traffic.  The officer caught up with it at that time and got out of his car with his gun drawn.  He ordered Bilotti to throw the keys out the window.  She did not initially comply.  She finally complied after being ordered to throw out her keys 10 times. Defendant and Bilotti were taken into custody.

At that point, defendant and the officer had the following exchange, which is what defendant claims on appeal should have been admitted:

"[Officer]:  ** in the car.

"[Defendant]:  He came running at me with a gun and I beat him to the punch.

"[Officer]:  He who?

"[Defendant]:  Rooster, the guy.

"[Officer]:  Okay.

"[Defendant]:  The guy that I shot, ** he was gonna, said he was gonna come to my house slit my family's throat, I, I, I won't do, I, I, stole my dad's

"[Officer]:  You know I'm not asking you any questions, right?

"[Defendant]:  I'm yeah, I'm just telling you the ** man,

"[Officer]:  Okay.

"[Defendant]:  I was scared for my family's life, he said fucking, met up with me ** fucking ** I'm gonna slit you and your family's throat, I stole my dad's fucking gun, I met up with him and he came running at me ** ** he's telling me ** He would have shot me if I didn't shoot him."

5

Defendant went on to repeat, "I'm just worried about my family, dude." And, "He's gonna fucking go kill my family, man."

Paramedics arrived and transported Heintz within a few minutes after he was shot. He died that afternoon as a result of the gunshot wound to the abdomen. A search of the interior of Bilotti's vehicle revealed a revolver on the front passenger floorboard and a nylon holster on the floor behind the front passenger seat. The cylinder of the revolver held five rounds, one of which had been fired. A forensic scientist compared the gun and the bullet recovered from Heintz's body and concluded that the bullet was consistent with defendant's gun. Another forensic scientist found material containing DNA on the grip and trigger of the gun. He compared that DNA with reference samples from defendant, and he concluded that defendant could not be excluded as the major contributor.

Prior to trial the People moved in limine to exclude defendant's statements at the time he was apprehended. The court granted the motion, stating, in relevant part, "With respect to section 356 of the Evidence Code, the Court has concluded that the statements of the defendant in the police car are not a part of any act or declaration at the time of the shooting. Therefore, the statements are inadmissible under this section."

In closing argument to the jury, defense counsel conceded that "there is sufficient evidence to support convictions on Count 2, 3, and 4." He asked for a conviction of voluntary manslaughter on the murder charge.

DISCUSSION

Defendant's sole contention on appeal is that the court prejudicially erred by excluding his statements made when he was apprehended. Defendant contends they should have been admitted under Evidence Code section 356 because "the prosecutor introduced evidence of [defendant's] flight to show guilt and consciousness of guilt. The

6

statements were made at the end of the flight, and they tended to explain and qualify it as attributable to fear instead of, or in addition to, consciousness of guilt." We disagree.

Evidence Code section 356, "sometimes referred to as the statutory version of the common law rule of completeness" (*People v. Parrish* (2007) 152 Cal.App.4th 263, fn. 3), provides as follows: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence" (Evid. Code, § 356).

The purpose of Evidence Code section 356 is to ensure one party does not mislead the jury by admitting solely the helpful aspects of an act, declaration, conversation, or writing. "The rule stated in Section 356," however, "only makes admissible such parts of an act, declaration, conversation, or writing as are relevant to the part thereof previously given in evidence." (Assem. Com. on Judiciary, com. 29B pt. 1A West's Ann. Evid. Code (2011 ed.) foll. § 356, p. 650; see *Witt v. Jackson* (1961) 57 Cal.2d 57, 67 [the rule "is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced"].)

There are a few problems with defendant's argument.

Initially, as the People argue, there was nothing incomplete admitted into evidence that needed to be completed. The *entire* flight was admitted into evidence, and *none* of the conversation after the flight was admitted into evidence. As our Supreme Court explained, the purpose of Evidence Code section 356 "is to prevent the use of *selected aspects* of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156, italics added.)

7

That does not end the inquiry, because the statute does provide that a "detached" act or conversation may be admitted if it is "necessary to make it understood . . . ." (Evid. Code, § 356.) Here, the prosecutor pointed to the flight as consciousness of generic guilt. His guilt was apparently so clear that defendant admitted he was guilty. The only issue was whether it was manslaughter or murder. But the flight sheds no light on that distinction; it simply evidences generic guilt. Thus the statements, which purportedly address the distinction between manslaughter and murder, were not necessary to understand the flight.

Finally, even if we thought the statements after being apprehended were part of the flight, the statements do not purport to explain why defendant fled. They explain why he shot: because he was purportedly scared for his own and his family's safety. But by the time of the flight, the alleged threat had been neutralized. As the trial court noted, "The statements of the defendant in the police car are not a part of any act or declaration at the time of the shooting." Defendant complains this rationale is nonresponsive to his argument, but it is responsive in the sense that the statements can only be understood as an explanation for the shooting. They are not relevant to the flight, and not part of the same act as the shooting, and thus inadmissible under Evidence Code section 356.

Defendant additionally contends the exclusion of the statements resulted in denial of his right to due process because "[t]he principal defense theory was that [defendant] was guilty of manslaughter, not murder, on a theory of imperfect self-defense or sudden quarrel. [Citations.] If the jurors had heard [defendant's] statements, they could have considered the statements' vivid content and fractured syntax in deciding whether [defendant] was in actual fear when he shot and when he ran." But due process does not excuse compliance with the rules of evidence. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 ["As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a

8

defense'"].)  And on appeal, defendant urges only one evidentiary basis for admitting the statement, which we have rejected above.  Nothing prevented defendant from presenting his defense.  (*Id.* at p. 1103 ["If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense'"].)  There was no due process violation.[2]

DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


ARONSON, J.

---

[2] The People contend defendant forfeited his objection to the exclusion of his evidence by failing to renew his request to admit the evidence at the time of trial.  Given our disposition above, we need not address that argument.