Filed 6/22/15  P. v. Garcia CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B256481 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA123130) |
| v. | |
| MATTHEW DAVID GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed with directions.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury convicted defendant, Matthew David Garcia, of first degree murder (Pen. Code,[1] § 187, subd. (a)) and willful, deliberate, premeditated attempted murder (§§ 664, 187, subd. (a)). The jury further found true firearm use and gang enhancement allegations. (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (c), (d).) Defendant was sentenced to 50 years to life in state prison. We affirm the judgment. We direct the clerk of the superior court to amend the abstract of judgment.

## II. THE EVIDENCE

Viewed in the light most favorable to the judgment (*People v. Banks* (2014) 59 Cal.4th 1113, 1156; *People v. Manibusan* (2013) 58 Cal.4th 40, 87), the evidence was as follows. On December 17, 2011, defendant—a gang member—shot and killed Carlos Lajovich. Defendant also shot and severely injured Sergio Moreno. Although the shooting occurred in rival gang territory, neither victim was a gang member. Witnesses saw the person who fired the shots run from the scene of the assault to a waiting white sport utility vehicle. Defendant's cousin, fellow gang member and co-defendant, Thomas Castaneda, was the driver. Law enforcement officers subsequently searched the residence where defendant and Mr. Castaneda both lived. The white sport utility vehicle was parked in the backyard. The gun defendant used to shoot the victims was buried in the backyard together with a box of bullets.

During the search, which lasted several hours, defendant and Mr. Castaneda were detained nearby in a parked van. Their conversations were recorded. The recordings were played for the jury at trial. After the gun was recovered, a deputy walked past the van holding the weapon in plain view. The following conversation ensued:

---

[1]     Further statutory references are to the Penal Code except where otherwise noted.

"CASTANEDA:  You got to say.  They are going to take me away.  They gonna take me away.  [¶]  GARCIA:  They're taking me away too dog.  [¶]  CASTANEDA:  They're taking me away from my kids.  Away from my kids fool.  [¶]  GARCIA:  Fool.  I'm gonna do the most fucking time homie.  [¶]  CASTANEDA:  You ain't doing shit.  Fucken I didn't touch that shit, just say you sold the fucking thing.  Just say it fool.  Just say it fool.  They're going take me away from my fucken kids fool.  I have to be out here for my girls fool.  Just say it.  Fuck.  [¶]  GARCIA:  Fuck Homie.  [¶]  CASTANEDA:  Just say it.  You can't let them take me from my girls fool.  . . .  Please.  Come on homie.  My kids.  Please help me.  [¶]  . . .  [¶]  GARCIA:  Don't say shit fool.  [¶]  CASTANEDA:  [H]uh?  [¶]  GARCIA:  Don't say shit dog.  I'm gonna deny everything fool.  They're going give us some time fool.  Not just you homie, me too dog.  Remember that fucken shit homie.  I got life too, dog.  [¶]  . . .  [¶]  CASTANEDA:  If they get the prints back on that fucken thing, watch.  Did you get to clean it?  [¶]  GARCIA:  Huh?  [¶]  CASTANEDA:  After I got done touching it last.  [¶]  GARCIA:  That was the last time I touched it fool.  [¶]  CASTANEDA:  You touched it last?  [¶]  GARCIA:  Ah, when at the house, the outside of the bag.  Plus there's a box of things in there.  A box of balas.  (*Bullets*)  [¶]  CASTANEDA:  (INAUDIBLE) been there.  [¶]  GARCIA:  God, we should have gotten that shit out of here dog.  [¶]  CASTANEDA:  I'll say whatever I gotta say, fuck.  Whatever dog.  [¶]  GARCIA:  Despensa (*sorry/ apology*) fool.  I love you homie.  I didn't mean to get you into this shit dog.  [¶]  CASTANEDA:  If you love me homie, you'll say what you gotta say, man.  [¶]  GARCIA:  What the fuck homie, you gonna let me go down by myself or what, homie?  [¶]  CASTANEDA:  Look, fool.  That's just it dog.  I'm not going to say anything, homie.  But if you love me, dog, you really love me, homie, then you wouldn't let my kids grow up without a dad . . . .  If you love me homie – you know what to do, homie.  [¶]  GARCIA:  If they say fool, who is it dog?  Say I ain't saying shit.  [¶]  CASTANEDA:  [Y]eah, fool.  [¶]  GARCIA:  That shit is going to catch us in the red dog.  We shouldn't have did that shit dog."

There was evidence that, initially, Mr. Moreno denied recognizing defendant.  Subsequently, however, Mr. Moreno admitted immediately recognizing defendant.  Mr.

Moreno had seen defendant around the neighborhood. Officer Brett Benson, who testified for the defense, spoke to Mr. Moreno in the immediate aftermath of the shooting. Officer Benson was asked about the conversation with Mr. Moreno. In that conversation, Mr. Moreno claimed not to have seen the person who fired the shots in the neighborhood prior to that night.

Detective Karen Shonka interviewed Mr. Moreno at the hospital the day after the shooting. Detective Shonka testified, "He was in a lot of pain, and he really seemed out of it . . . ." Nevertheless, the detective spoke with Mr. Moreno for a little over 20 minutes. In that interview, Mr. Moreno denied having seen the person who fired the shots previously. All Mr. Moreno saw was "a short guy." Also, Mr. Moreno said he was intoxicated. So much so it was impossible to see what the person who fired the shots looked like. Mr. Moreno also several times denied having seen the person who fired the shots before. Mr. Moreno did, however, give Detective Shonka a description of the person who fired the shots that was consistent with defendant's appearance.

On December 23, 2011, six days after the shooting, Mr. Moreno identified defendant in a photographic lineup. It took Mr. Moreno about five seconds to identify defendant. Detective Mitchell Carrillo showed Mr. Moreno the photographic lineup. Mr. Moreno was "pretty sure" about the identification. Mr. Moreno said, "That's him, . . . the guy who shot me . . . ." Mr. Moreno then admitted seeing defendant around the neighborhood from time to time. At trial, Mr. Moreno testified to recognizing defendant as soon as they walked up to one another on the evening of the shooting. Mr. Moreno had seen defendant in the neighborhood prior to the shooting.

Dr. Mitchell Eisen testified for the defense on eyewitness identification and suggestibility. Dr. Eisen discussed multiple factors influencing and detracting from eyewitness identifications and witnesses' memories. Dr. Eisen was asked to respond to a hypothetical scenario: "Assume that there is a witness to a shooting. The following day that witness is specifically asked by the police whether [he has] ever seen the shooter in the neighborhood before and he answers no. Assume that some point after that he . . . hears from family and friends that [the] shooter may have been someone from the

4

neighborhood and the police develop a suspect, put the suspect in the six-pack and the suspect is in fact from the neighborhood and someone that the witness has encountered before. [¶] Assume that the witness points to the person he knows from the area, indicates that he does know him days later when he's being shown the six-pack and that's the shooter. [¶] Based on just the research in general, what is the best indicator of a witness'[s] memory, the report given the day after the event or the report given after an extended delay of several days?" Dr. Eisen responded that memory reports given closer in time to the event are the best indication of what someone remembers.

## III. DISCUSSION

### A. Evidence Code Section 356

As noted above, the jury heard a recording of the codefendants' incriminating conversation while they were detained in a van. Defendant sought to admit, under Evidence Code section 356, portions of a subsequent conversation between the codefendants. The conversation took place several hours later, after the two men were transported to a jail and placed in separate holding cells: "[GARCIA]: . . . That shit should have never been there dog. [¶] [CASTANEDA]: What? [¶] [GARCIA]: That thing. [¶] [CASTANEDA]: Yeah? It happens fool. [¶] [GARCIA]: Fucking Wicked, dog." Defense counsel argued the jury would hear testimony "Wicked" was a fellow gang member's moniker. Defense counsel asserted the foregoing conversation was exculpatory in that it demonstrated "Wicked" was responsible for the gun being buried in defendant's backyard. The trial court denied the request stating: "There are two different conversations . . . . One is in the van. They are together. The other one they're in jail somewhere. . . . [¶] . . . [¶] . . . [T]wo completely different conversations. So -- and there is no exception [to the hearsay rule] for what I see here."

Evidence Code section 356 states in part: "Where part of [a] . . . conversation . . . is given in evidence by one party, the whole on the same subject may be inquired into by

5

an adverse party; . . . and when a detached . . . conversation . . . is given in evidence, any other . . . conversation . . . which is necessary to make it understood may also be given in evidence." Our Supreme Court has explained: "The purpose of this section is to prevent the use of selected aspects of a conversation . . . so as to create a misleading impression on the subjects addressed. (*People v. Price* [(1992)] 3 Cal.4th 195, 235.) Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' (*People v. Breaux* [(1991)] 1 Cal.4th 281, 302; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1174.)" (*People v. Arias* (1996) 13 Cal.4th 92, 156; accord, *People v. Williams* (2006) 40 Cal.4th 287, 319.) Our review is for an abuse of discretion. (*People v. Williams, supra,* 40 Cal.4th at p. 319; *People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

We find no abuse of discretion. It was within the trial court's Evidence Code section 356 discretion to exclude a conversation between the codefendants to explain statements they made several hours earlier at a different location. (*People v. Williams, supra,* 40 Cal.4th at p. 319; *People v. Barrick* (1982) 33 Cal.3d 115, 131-132; *People v. Johnson* (2010) 183 Cal.App.4th 253, 287.) The two statements were not part of the same conversation. The two conversations were separated in time and place. Also, without abusing its discretion, the trial court could rule the jailhouse conversation was not necessary to make the earlier conversation understood. (*People v. Farley* (2009) 46 Cal.4th 1053, 1103; *People v. Barrick, supra,* 33 Cal.3d at p. 131, fn. 4; *People v. Johnson, supra,* 183 Cal.App.4th at p. 288.) There was no violation of defendant's federal constitutional rights. (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1258-1259; *People v. Lucas* (1995) 12 Cal.4th 415, 464-465.) Moreover, given the strength of the evidence against defendant, any error was harmless beyond a reasonable doubt.

## B. CALJIC No. 2.92

The jury was instructed pursuant to CALJIC No. 2.92 as follows: "In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness'[s] identification of the defendant, including, but not limited to, any of the following: [¶] . . . [¶] The extent to which the witness is either *certain* or uncertain of the identification; [¶] . . . ." (Italics added; see also CALCRIM No. 315.) Defendant argues CALJIC No. 2.92—to the extent it discusses certainty—is contrary to recent social science research on eyewitness identification and human memory. Our review is de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Guiuan* (1998) 18 Cal.4th 558, 569-570.) We decline to so hold. Our Supreme Court has repeatedly approved the certainty factor in CALJIC No. 2.92. (*People v. Ward* (2005) 36 Cal.4th 186, 213; *People v. Arias, supra,* 13 Cal.4th at p. 168; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232; *People v. Wright* (1988) 45 Cal.3d 1126, 1141.) Hence there was no error. The jury was properly instructed pursuant to CALJIC No. 2.92. (*People v. Ward*, *supra*, 36 Cal.4th at p. 213; *People v. Arias*, *supra*, 13 Cal.4th at p. 168; *People v. Johnson*, *supra*, 3 Cal.4th at pp. 1231-1232; *People v. Wright, supra,* 45 Cal.3d at p. 1141.) Even if there was error, it was harmless under any standard of review. The accuracy and reliability of Mr. Moreno's eyewitness identification was extensively explored through: cross-examination; testimony as to Mr. Moreno's initial failure to identify defendant; opinion testimony on factors undermining eyewitness identification; and argument to the jury. (See *People v. Ward, supra,* 36 Cal.4th at p. 214; see also *People v. Boyer* (2006) 38 Cal.4th 412, 481; *People v. Sanders* (1995) 11 Cal.4th 475, 510.)

## C. Cumulative Error

Defendant contends he is entitled to reversal because of cumulative error. We find no prejudicial legal error. Therefore, we reject defendant's argument the cumulative

effect of all the errors requires reversal.  (*People v. Jones* (2013) 57 Cal.4th 899, 981; *People v. Edwards* (2013) 57 Cal.4th 658, 746.)

## D.  The Abstract of Judgment

The trial court orally imposed a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) as to each count.  We asked the parties to brief the question whether the June 9, 2014 abstract of judgment must be amended to include those fees.  (See *People v. Jones* (2012) 54 Cal.4th 1, 89; *People v. Mitchell* (2001) 26 Cal.4th 181, 185-188.)  In response, appointed appellate counsel, Sharon M. Jones, filed an amended abstract of judgment in the trial court.  The abstract of judgment filed on April 27, 2015, includes the court operations and court facilities assessments.

However, the "Other orders" section of the abstract of judgment—addressing restitution—has *also* been amended.  And, as amended, it does not appear to reflect the trial court's orders.  Therefore, we asked the parties to address the question whether the April 27, 2015 abstract of judgment must be amended to provide:  "Other orders . . . : Make restitution to the state victim compensation board in the sum of $68,000, to reimburse payments to the victim from the restitution fund, plus interest at 10 percent per year from the date of sentencing.  (Pen. Code, § 1202.4, subd. (f)(4).)  Make restitution to the victim, Sergio Alonso-Moreno, in the sum of $34,509.46 plus interest at 10 percent per year from the date of sentencing.  (Pen. Code, § 1202.4, subd. (f).)  Co-defendant Thomas Anthony Castaneda has been found jointly and severally liable for the foregoing restitution payments."  We will direct that the abstract of judgment be amended to so reflect. (See *People v. Jones, supra,* 54 Cal.4th at p. 89; *People v. Mitchell, supra,* 26 Cal.4th at pp. 185-188.)

## IV. DISPOSITION

The judgment is affirmed. Upon remittitur issuance, the superior court clerk must amend the abstract of judgment to provide: "Other orders . . . : Make restitution to the state victim compensation board in the sum of $68,000, to reimburse payments to the victim from the restitution fund, plus interest at 10 percent per year from the date of sentencing. (Pen. Code, § 1202.4, subd. (f)(4).) Make restitution to the victim, Sergio Alonso-Moreno, in the sum of $34,509.46 plus interest at 10 percent per year from the date of sentencing. (Pen. Code, § 1202.4, subd. (f).) Co-defendant Thomas Anthony Castaneda has been found jointly and severally liable for the foregoing restitution payments." The superior court clerk must deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


MOSK, J.


KRIEGLER, J.

9