Filed 3/5/15  P. v. Vinson CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B247084 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA389030) |
| v. | |
| RICKY RAY VINSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William N. Sterling, Judge.  Affirmed in part and reversed in part with directions.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Ricky Ray Vinson, appeals his conviction for first degree murder with firearm use and gang enhancements (Pen. Code, §§ 187, 12022.53, 186.22, subd. (b)).[1] He was sentenced to state prison for a term of 50 years to life.

The judgment is affirmed in part and reversed in part.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *The shooting.*

Christopher Lee testified that on August 28, 2008, at about 12:15 a.m., he was leaving a liquor store near the corner of Vernon Avenue and Wall Street when he witnessed a robbery. Two Hispanic men had pinned an African-American man to the ground and were going through his pockets. When the robbers noticed Lee, they came over and one of them grabbed him. Lee broke free and started running. Just then Lee spotted defendant Vinson in a car and flagged him down. Lee and Vinson were both members of the Four Trey Gangster Crips gang.

Lee got into Vinson's car and said two men had tried to rob him. As they drove back to the liquor store, Vinson asked Lee to hold his gun. When Lee saw the two robbers, he and Vinson got out of the car. Vinson asked one of them if he remembered him. The man responded by swinging at Vinson and a fist fight ensued. Meanwhile, Lee put Vinson's gun in the glove box. Vinson returned to his car, grabbed the gun and shot and killed one of the robbers. Vinson later told Lee "he didn't like the Hispanic dude" and the shooting happened "because he had got into it before at that same liquor store." Lee pled guilty to voluntary manslaughter in exchange for a six-year prison term and a promise to testify truthfully at Vinson's trial.

Luis Ramirez testified he had gone to the liquor store that night and, on the way home, ran into his friend Lester Pineda, who was with another Hispanic man. Ramirez continued home and shortly thereafter saw Pineda walking toward the corner of 45th

---

[1] All further references are to the Penal Code unless otherwise specified.

Street and Wall. A car with two occupants pulled up. Vinson, the driver, got out and began to argue with Pineda, saying something like "[Y]ou want to fuck with my homies[?]" Vinson then returned to the car, retrieved a gun and shot Pineda in the chest. After Pineda collapsed onto the ground, Vinson shot him three more times and then drove off.

That same night, Gloria Rosales was at home on the corner of 45th Street and Wall. She saw Pineda and another Hispanic man; they seemed panicked and looked like they were trying to hide. A car drove up. The driver got out, asked Pineda why he was "tripping on his homie." Pineda said "nobody was tripping," and the driver said he didn't want to see Pineda "in his block anymore." The driver returned to his car, was handed a gun by the passenger, and then shot Pineda. The driver started back to his car, but then returned and shot Pineda three more times.

2. *Gang evidence.*

In March 2004, Officer David Haskins was on patrol in the area of 45th and Main when he saw an African-American man spray painting graffiti on a building wall. When Haskins pulled up, the man dropped the spray can and got into a car. Haskins stopped the car, which was being driven by Vinson. On the car's floorboard there was a spray can similar to the one which had been dropped near the wall. The wall graffiti read: "EXSTSIDE 43/2 GC," "AVONK" and "BGUMK." The letters AVONK also had an X drawn through them.

In March 2006, Vinson told Officer Sharlton Wampler that he belonged to the Four Trey Gangster Crips.

Officer Alfred Garcia, a gang expert, monitors the Four Trey Gangster Crips. Garcia testified gangs mark their territory with graffiti and commit crimes to instill fear in the community. In Garcia's opinion, both Vinson and Lee had been members of the Four Trey Gangster Crips in 2008. Given a hypothetical question tracking the facts of this case, Garcia opined the shooting had been committed for the benefit of the Four Trey Gangster Crips.

3

## CONTENTIONS

1. The trial court erred by discharging a juror midway through the trial.

2. The prosecutor committed misconduct by showing a photographic lineup to a witness before having him view a live lineup.

3. The trial court erred by admitting evidence about one of Vinson's gang tattoos.

4. By the Attorney General: The trial court failed to impose two mandated monetary assessments as part of Vinson's sentence.

## DISCUSSION

1. *Trial court had good cause to discharge a juror for sleeping.*

Vinson contends the trial court erred by excusing one of the jurors prior to deliberations without good cause. This claim is meritless.

a. *Background.*

At the conclusion of testimony from Dr. Fraser, the defense eyewitness identification expert, Juror No. 1 was sound asleep and had to be shaken awake. Dr. Fraser told the trial court that the juror had been asleep during his testimony both that day and the day before. The court asked if either side wanted to have the juror discharged for falling asleep, saying: "If there's no motion to dismiss him from either side, then I'll leave him on." Neither side asked for dismissal.

Two days later, other members of the jury informed the court that Juror No. 1 had been sleeping, talking to himself and making distracting noises. Some jurors complained their own ability to concentrate was being impaired, others that the behavior had simply been annoying, and others had not noticed anything.

While conferring with counsel, the trial court said, "I note for the record that I was watching him today and there were a few occasions where he was not only yawning deeply, but throwing his head back so he was looking backward and up at the ceiling during testimony and yawning deeply while testimony was going on." Regarding the earlier incident during Dr. Fraser's testimony, the trial court said: "[Juror No. 1] was sound asleep. None of us could rouse him by talking to him. He had to be shaken. And even then, I was afraid he might have had a heart attack or something because he was so

4

unresponsive even when he was being shaken." The trial court questioned whether the juror was "hear[ing] all of the evidence."

Juror No. 1 was then questioned. He claimed to have slept through only two minutes of Dr. Fraser's testimony and that this had been the only time he failed to pay attention. He said he was not angry or upset about being questioned by the court.

After Juror No. 1 exited the courtroom, the trial court announced there was good cause to dismiss Juror No. 1 over defense counsel's objection. The court said it had refrained from discharging the juror earlier only "because the defense said they wanted to keep him," but now "there's been more things that have come to light. . . . [I]t's clear to me he missed a very significant portion of Dr. Fraser's testimony." The court said, "I'm finding at this point because of the additional information about him talking to himself, what I saw this morning, looking at the ceiling for at least 30 seconds and yawning, that he is unable to function and perform his duties."

b. *Legal principles.*

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . . the court may order [him] to be discharged . . . ." (§ 1089.) " 'Grounds for . . . discharge of a juror may be established by his statements or conduct, including events which . . . are reported by fellow panelists.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 588.)

A trial court's decision to discharge a juror for good cause under section 1089 is subject to review for abuse of discretion (*People v. Hart* (1999) 20 Cal.4th 546, 596), and will be upheld unless it falls outside the bounds of reason (*People v. Earp* (1999) 20 Cal.4th 826, 892). "Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion [citation], we have concluded 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. [Citation.] . . . [W]e [have] held that the basis for a juror's disqualification must appear on the record as a 'demonstrable reality.' This standard involves 'a more comprehensive and less deferential review' than simply

5

determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] . . . However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*People v. Lomax*, *supra*, 49 Cal.4th at pp. 589-590, fn. omitted.)

c. *Discussion.*

Vinson contends it was error to discharge Juror No. 1 because "the record failed to reveal as a demonstrable reality that [he] could not perform his duty as a juror." But our Supreme Court has held that "[a] trial court does not abuse its discretion if it discharges a juror who falls asleep during the trial. [Citation.]" (*People v. Ramirez* (2006) 39 Cal.4th 398, 458.) In *Ramirez*, "the trial judge had observed that the juror had difficulty paying attention during trial and appeared to fall asleep. The judge's observations were consistent with the testimony of the jury foreperson that the juror had fallen asleep twice during deliberations. The trial court, therefore, did not abuse its discretion in discharging the juror." (*Ibid*.) In *People v. Johnson* (1993) 6 Cal.4th 1, disapproved on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826, 879, the defendant claimed on appeal there was no evidence the juror had actually been sleeping. Our Supreme Court rejected this claim, holding: "[T]here was ample evidence indicating that on one or more occasions [the juror] had actually fallen asleep during trial. The court, its two deputies, and the prosecutor each stated on the record that they had observed defendant exhibiting various physical indicia of sleep, including eye closures, head nodding, and slumping in his chair." (*Johnson*, at p. 21.)

Here, there was substantial evidence Juror No. 1 had been both talking to himself and falling asleep during testimony. There was substantial evidence contradicting his assertion to the trial court that he had fallen asleep on only one occasion and only for two minutes. Vinson argues he "has never contested that a court can discharge a juror for sleeping during trial. . . . But as noted, after the one incident of Juror No. 1 dozing off [i.e., during Dr. Fraser's testimony], he did not do so again. The court found that that one

6

incident did not warrant his dismissal, and the court did not simply change its mind two days later, as Respondent seems to suggest."

On the contrary, the record shows the trial court did change its mind after subsequently concluding there had been multiple sleeping incidents, that Juror No. 1 had either lied to the court about the extent of his sleeping or was oblivious to it, and that Juror No. 1 had been talking to himself – all further indicia that the juror was not paying attention to the trial.[2] The trial court did not abuse its discretion because the basis for Juror No. 1's discharge appears on the record as a demonstrable reality. (See *People v. Lomax*, *supra*, 49 Cal.4th at pp. 589-590.)

2. *Prosecutor did not commit misconduct by having a witness view a photo array before viewing a live lineup.*

Vinson contends the prosecutor committed misconduct by showing Luis Ramirez a photographic lineup before having him view a live lineup in which Vinson appeared. This claim is meritless.

a. *Background*.

Pineda was killed on August 28, 2008. On May 7, 2009, the trial court issued an Order for Lineup, directing the Los Angeles County Sheriff to conduct a live lineup that would include Vinson. The order stated: "The witnesses are not to be shown any photographs prior to the lineup, regardless of whether they have seen some previously." (Court Exh. 3) This order was signed by Judge Craig Mitchell. A second, identical order was subsequently issued on November 18, 2011, this time signed by Judge Richard Kemalyan. (Court Exh. 2) However, on December 20, 2011, before any live lineup was

---

[2]     Contrary to Vinson's argument, there was no error in the trial court's initially declining to discharge Juror No. 1, and then reconsidering in light of additional information. (See *People v. Ramirez, supra,* 39 Cal.4th at p. 457 [advised that juror had been sleeping during testimony, trial court admonished entire jury to remain attentive, and then properly discharged juror two weeks later upon learning he had twice fallen asleep during deliberations].)

7

held, the prosecutor showed Ramirez a photographic lineup. Ramirez picked out Vinson's picture, and he subsequently identified Vinson at a live lineup and then at trial.

Vinson moved to suppress this identification evidence on the ground the prosecutor had committed misconduct by showing Ramirez the photo array *before* showing him the live lineup. The prosecutor opposed the motion, offering the following explanation for how Ramirez's identification had come about. The preliminary hearing had been scheduled for December 20, 2011, before Judge Kemalyan. Until that time, the prosecution had been unable to secure Ramirez's attendance in court. When he did appear that day, the prosecutor told defense counsel he planned to have Ramirez testify. Defense counsel asked Judge Kemalyan to continue the preliminary hearing so Ramirez could be shown a live lineup before getting to see Vinson in the courtroom sitting at the defense table. The prosecutor objected because of difficulties already encountered in getting Ramirez to court. Judge Kemalyan indicated he was inclined to deny a continuance in these circumstances. Recognizing the defense had a legitimate concern about the impending in-court identification, the prosecutor offered to interview Ramirez over the lunch hour and see if he could pick out Vinson and Lee from photographic lineups; if Ramirez could not, then there would be no need for the preliminary hearing to be continued.[3] Neither defense counsel nor the trial court objected to this proposal. Shown the photo arrays, Ramirez identified both Lee and Vinson. Defense counsel then again asked to continue the preliminary hearing so a live lineup could be arranged, and the prosecutor did not object. Ramirez subsequently identified Vinson at the live lineup, the preliminary hearing and at trial.

While arguing in support of the suppression motion, defense counsel essentially agreed with the prosecutor's description of what had occurred, saying Ramirez "was a reluctant witness" who "didn't want to get involved," and the People "were concerned that if the case was continued for a live lineup, they would never find him again. . . . And

---

[3]     The implication was that Ramirez would then not be asked to make an identification at the preliminary hearing.

8

they wanted to preserve his testimony. [¶] Judge Kamalyan wasn't inclined to grant a continuance under those circumstances. . . ."

The trial court [William Sterling, J.] ruled the prosecution could put on the evidence of Ramirez's identification of Vinson, reasoning the lineup orders had been overtaken by events, the prosecutor had proposed a reasonable way of dealing with Ramirez's reluctance to testify, and Vinson had not objected to the prosecutor's suggestion that Ramirez be shown the photo array before testifying at the preliminary hearing.

b. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

c. *Discussion.*

Vinson argues: "The prosecutor's violation of the orders not to show its witnesses any photographs prior to a live lineup constituted egregious misconduct which, by tainting Mr. Ramirez's selection at the subsequent live lineup, infected the trial with such unfairness as to implicate due process." We disagree, however, that the prosecutor's actions can be fairly characterized as violating trial court orders. It appears that, given Ramirez's failure to make himself available until the very day of the preliminary hearing, and the People's legitimate concern he might disappear again, everyone recognized the virtue of the prosecutor's proposed solution. By offering no objection to it, both defense counsel and the trial court implicitly agreed to the plan.

9

Hence, we agree with the Attorney General's argument: "Under these circumstances, the only reasonable conclusion that the prosecutor could have drawn was that the court and appellant's counsel approved of his proposed course of action. A prosecutor, of course, is not guilty of misconduct when he acts in accordance with the court's ruling. [¶] In sum, this was not a situation where a prosecutor engaged in sneaky, underhanded tactics to obtain a conviction; to the contrary, the prosecutor . . . explicitly and forthrightly announced his intentions to the court and opposing counsel and, hearing no objection, carried them out. Simply put, this is not the stuff of prosecutorial misconduct." (See, e.g., *People v. Earp*, *supra*, 20 Cal.4th at p. 861 [" 'A prosecutor is not guilty of misconduct when he questions a witness in accordance with the court's ruling.' "].)

There was no prosecutorial misconduct here.

3. *Trial court did not err by admitting evidence of Vinson's tattoo*.

Vinson contends the trial court erred by not excluding evidence he had a tattoo which the jury could have interpreted as an admission he had killed rival gang members. This claim is meritless.

a. *Background*.

Prior to trial, defense counsel filed a motion to exclude evidence of Vinson's gang tattoos on the ground they amounted to inadmissible character evidence and would be more prejudicial than probative. Counsel argued there was no reason for this evidence because the defense would not be disputing Vinson's membership in the Four Trey Gangster Crips. The trial court disagreed, saying the evidence was probative of Vinson's motivation for shooting Pineda: "Isn't the People's theory that Mr. Lee is an O.G.[4] from the Four Trey Gangster Crips, that he was harassed, and the victim and another fellow tried to rob him. The People's theory is that [Vinson] acted on behalf of someone who

---

**4**    "O.G." stands for "original gangster," which the online Urban Dictionary defines as "someone who has been around, old school gangster." (http://www.urbandictionary.com/define.php?term=OG [as of 3/4/2015].)

10

was at least once an active member and now an O.G. . . . in his gang and [Vinson] was seeking to vindicate his gang?"

During his testimony, Garcia, the prosecution gang expert, characterized one of Vinson's tattoos as referring to the Avalon Gangster Crips gang. The tattoo depicted the number four, inside of which appeared the letters "AK" with the "A" crossed out. Garcia testified: "To me, that represents an Avalon killer. And again, the A is crossed out." Defense counsel moved for a mistrial, arguing it was prejudicial to characterize Vinson as "an Avalon killer." The prosecutor asserted the evidence merely showed Vinson's "active membership in the gang, particularly based on this officer's testimony about . . . their rivals geographically. . . . [I]t's just rival gangs with adjoining turfs." The trial court agreed it would be improper to use the tattoo evidence to establish that "specifically . . . he's a killer," but concluded that is not what it showed. Rather, the evidence showed "that the Four Trey Gangster Crips consider themselves as Avalon killers . . . . that it's [the] gang itself that considers themselves to be Avalon killers." The trial court ruled, "I don't think it creates any kind of reasonable probability that the jury will decide this case on any kind of improper propensity evidence."

When testimony resumed, the trial court gave the jury the following limiting instruction: "[T]he testimony regarding A-K on the tattoo, you're not to consider that as evidence that Mr. Vinson[ ] would or would not kill a particular Avalon gang member or anyone else. [¶] You may consider it in terms of when [*sic*] he's a gang member, whether he belongs to 43rd Gangster Crips, and to the degree of or seriousness of his membership, but you're not to take it as proof that he is a killer or would . . . kill somebody."

b. *Discussion*.

Vinson contends the trial court "violated . . . due process when it admitted the evidence of his tattoos, allowing the prosecution to introduce evidence indicating that he killed Avalon gang members." Vinson argues this amounted to improper propensity evidence under Evidence Code section 1101. The contention fails.

11

The admission of other crimes evidence is governed by Evidence Code section 1101. "Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted.)

Vinson's claim is predicated on the notion that the evidence – the tattoo itself and Garcia's characterization of it – showed him to be a self-professed killer of rival gang members from the Avalon Gangster Crips. Thus, Vinson complains evidence that he "had killed others before and even had a tattoo stamped on his body to advertise that fact, told the jury that he was precisely the type of person who would have committed the charged shooting," and, therefore, the evidence was "inherently prejudicial." Vinson argues Garcia "did not qualify [his] testimony by saying that the tattoo really only represented a sign of disrespect as opposed to indicating that Mr. Vinson had killed Avalon gang members . . . . Indeed, the jury had every reason to believe that Mr. Vinson had this tattoo placed on his body for the rest of his life to memorialize *that he had in fact killed one or more members of the Avalon gang*." (Italics added.)

Not so. As set forth below, the clear import of Garcia's testimony was that Vinson intended his tattoo to be seen as an act of disrespectful provocation, not as a documentation of historical fact. Garcia initially testified about wall graffiti, explaining that "EXSTSIDE 43-2 GC" utilized an X to spell "EAST" because " 'A' is their main rival's initial, Avalon Gangster Crips," and "[s]o it's basically . . . disrespecting their turf and their gang." The graffiti "AVONK" was similarly disrespectful: "[I]nstead of calling them Avalons, they will call them Avons. And the K at the end would be Avon Killer, the K represents killer." 4) The graffiti "BGUMK" was meant to denigrate another rival of Vinson's gang, the Five Deuce Broadway Gangster Crips, by "call[ing]

12

them Bubble Gums. They just put B-U-M [*sic*], short for Bubble Gum. [¶] Q. Would it be disrespected [*sic*] if those letters were crossed out? [¶] A. Yes, it would."

Garcia also testified:

"Q. By [the prosecutor]: Now, crossing out another gang['s] graffiti, is that a form of disrespect?

"A. Yes, it is.

"Q. Okay. What is the significance or importance of disrespect to a street gang?

"A. Uhm, we talked about vandalizing the property or initials, pointing into another rival gang territory, just disrespecting that gang. That's an ongoing feud. Back to this day, it's ongoing feud between the Four Treys, Five Treys and Five Deuces."

Following this description of wall graffiti, Garcia discussed Vinson's tattoo depicting the number four, inside of which were the letters "AK" with the "A" crossed out. Garcia opined: "To me, that represents an Avalon killer. And again, the A is crossed out."

But Garcia never testified the gang members who added "K"s to their rivals' names (i.e., in the "AVONK" and "BGUMK" graffiti) were claiming to have personally killed members of those gangs. Rather, Garcia testified this was intended to be a provocation, a sign of disrespect. In the same vein, Garcia characterized Vinson's "AK" tattoo with the "A" crossed out as a sign of disrespect, not an admission that Vinson had actually killed a member of that rival gang. The trial court cemented this interpretation of the evidence by instructing the jury the tattoo did not mean Vinson had killed or would kill someone.

We conclude the evidence of Vinson's tattoo was properly admitted under Evidence Code section 1101, subdivision (b), to prove the extent of his loyalty to the gang. (See *People v. Parrish* (2007) 152 Cal.App.4th 263, 279 ["that gang tattoos signified loyalty to the gang was relevant to show the level of defendant's commitment to the gang"].) As the Attorney General argues, "[T]he 'AK' tattoo evidence was probative as to appellant's membership in the Four Trey Gangster Crips gang and his level of commitment to it. The fact that appellant had branded himself an 'Avalon Killer'

13

indicated that he was extremely devoted to his gang. And appellant's devotion to the gang and its members gave him a motive to avenge the attempted robbery of Lee, his fellow Four Trey Gangster Crips gang member."

        4. *Trial court failed to impose correct mandatory penalty assessments.*

        The Attorney General contends the trial court erred during sentencing by failing to impose two monetary assessments. This claim has merit.

        The trial court imposed a $20 court operations assessment pursuant to section 1465.8, subdivision (a)(1), but that statute provides: "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense . . . ." The Attorney General notes that while this assessment was originally $20, it was increased to $30 in 2009 and then to $40 in 2010, and Vinson was convicted in 2012. (See *People v. Alford* (2007) 42 Cal.4th 749, 754 [date of conviction, not date of offense, determines applicability of § 1465.8 assessment].) The trial court should have imposed at $40 assessment rather than a $20 assessment.

        In addition, Government Code section 70373, subdivision (a)(1), provides: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense . . . . The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony and in the amount of thirty-five dollars ($35) for each infraction." The trial court failed to impose this assessment.

        "A claim that a sentence is unauthorized . . . may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court. [Citations.]" (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.) We will order the trial court to correct Vinson's sentence.

## DISPOSITION

The judgment is affirmed in part and reversed in part. Vinson's sentence shall be corrected by imposing the additional $50 in assessments described herein. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

15