Filed 4/28/21  P. v. Garrison CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086876 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE009591) |
| v. | |
| MICHAEL CONCEPCION GARRISON, | |
| Defendant and Appellant. | |

A jury convicted defendant Michael Concepcion Garrison of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and found that he personally inflicted great bodily injury (GBI) (Pen. Code, § 12022.7, subd. (a)).  Sentenced to a state prison term of five years (the two-year low term on the offense, plus three years consecutive for the enhancement), defendant contends:  (1) The trial court erred prejudicially by denying

1

defendant's request under Evidence Code[1] section 356 to play the complete video of his interview with the lead detective after the detective testified about parts of it; (2) The court abused its discretion by imposing instead of staying the GBI enhancement. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

On May 14, 2017, defendant lived in Citrus Heights with his seven children and Ursula A., the mother of six of them. His friends Ryan S. and Traves S. came by defendant's house to visit and to smoke marijuana with him.

Ryan S. asked defendant where Ursula A. and the kids were; defendant answered tensely that he did not know or care. He went back to his bedroom, where his friend Zattu A. was; Ryan S. and Traves S. followed him. Defendant and Ryan S. started to argue. Traves S. went outside to his truck to look for a lighter.

As defendant sat on his bed holding a wrap for a "blunt," Ryan S., standing beside the bed, got upset and hit a tray that held marijuana, knocking it off the bed. (The parties stipulated that at the preliminary hearing Ryan S. testified that he said provocatively: " '[I]s it really got to go this far, like we really got to get into it?' We really got . . . into a fight.")

After hitting the tray, Ryan S. stepped back. Defendant, an experienced martial artist, lunged at him. Ryan S. threw defendant to the ground; defendant wrapped his legs around Ryan S.'s waist and put him in an arm hold. Ryan S. started to feel something strange and asked defendant what he had done. Defendant said he had stabbed Ryan S., then pulled a knife out of his back, but would not let him go or drop the knife. The fight

---

[1]     Undesignated statutory references are to the Evidence Code.

2

ended when Traves S., summoned by Zattu A., came into the room, told defendant to stop, and tried to unlock defendant's feet from around Ryan S.'s head.

Defendant folded up the knife, got up, and ran out of the room. Then he came out to the living room where Ryan S. was lying, said he was sorry and did not mean to do it, and added: "I love you, bro."

Ryan S. called 911, claiming he did not know who had stabbed him. At the hospital, he was found to have two knife wounds to his shoulders and two to his back; the stab that inflicted one wound had also broken a rib, punctured his diaphragm and intestines, and caused his lung to collapse. He underwent surgery and was still recovering at the time of trial.

Ryan S. admitted that in 2009 he severely beat another person and was sentenced to prison.

The officer who responded to the 911 call found Ryan S. on the ground halfway outside the doorway. Traves S. was holding a towel to Ryan S.'s back. Ryan S. still would not say who had stabbed him. As Zattu A. and defendant came out, defendant said, "I did it. I stabbed him." He added, "We were fighting, he got accidentally stabbed." A police search of the house and grounds did not find the knife.

Ursula A. and defendant were having difficulties in their relationship at the time of the stabbing; she and the children were out when it happened. Three days before, defendant had accused her of having a romantic relationship with Ryan S., but according to her they were just friends.

*Defense Case*

Defendant testified on his own behalf. According to defendant, when Ryan S. arrived, defendant was in his bedroom using a knife to open a cigar in order to replace its contents with marijuana. After the conversation about Ursula A. and the kids, Ryan S. followed defendant back to the bedroom and became aggressive, threatening, "I'll beat your fucking ass." Defendant said, "If you feel like that, bro, I'm right here."

3

According to defendant, as he sat on his bed with a tray of marijuana in his lap and the cigar and knife in his hands, Ryan S. swung at him, knocking the tray off defendant's lap, then swung again and scratched him under the eye. While still sitting on the bed, defendant punched Ryan S. four times in the face. Ryan S. put defendant in a bearhug, and defendant wrapped his legs around Ryan S. as a defensive move. As they tussled, falling backward on the bed, defendant's right arm hit the edge of an entertainment center near the bed, causing the knife in his hand to "poke" Ryan S. Defendant immediately let go of the knife, which he did not find afterward. This was the only wound he recalled making; Ryan S. must have suffered the others somehow during the struggle.

Defendant feared Ryan S. could hurt him, having been nearby in 2009 when Ryan S. administered the beating that led to his prison term. Defendant admitted, however, that he was trained in martial arts.

Defendant acknowledged that he and Ursula A. were having relationship problems at the time of the offense. During arguments he had accused her of cheating on him, even if he did not believe it, and had mentioned Ryan S. because "he's always here"; he had said this to her twice in the week before the incident.

Defendant denied telling an officer at the crime scene that Ryan S. was stabbed by falling on defendant's knife. He also denied telling a detective later that Ryan S. got stabbed by coming forward at defendant when defendant had thrown his arms up. He insisted that he had consistently told his "bearhug" story to the police. He still claimed he did not know how Ryan S. got three of his four stab wounds.

*Rebuttal*

An officer who spoke to defendant at the crime scene testified that defendant said the stabbing was an accident, Ryan S. had fallen on defendant's knife during a tussle, and defendant did not know how Ryan S. had suffered the other wounds.

Detective Deborah Bayer-Evans, who conducted an hourlong audio- and video-recorded interview of defendant later that evening at the police station, testified that

4

defendant at first expressed no concern for Ryan S. and seemed disconnected, but became more engaged as he went on.

According to Detective Bayer-Evans, defendant changed his story three times as to how Ryan S. was stabbed. First defendant said Ryan S. fell on defendant's knife; then defendant said he had probably stabbed him when defendant threw up his arms the first time; then he said he had thrown "blows" and the stabbing might have happened then. When asked if Ryan S. had bearhugged him, defendant said no. Defendant guessed that Ryan S.'s broken rib came about when they were thrashing around and hit the television.

Detective Bayer-Evans also testified that defendant said he was not concerned that Ryan S. might beat him up. Asked if he thought Ryan S. and Ursula A. were having an affair, defendant tensed up, got upset, and said he did not know.

Detective Bayer-Evans opined that defendant was not forthright during the interview. However, the trial court sustained defendant's objection to that remark.

Detective Bayer-Evans believed defendant never gave her a straight answer about how Ryan S. came to be stabbed four times.

As we explain below, defendant moved under section 356 (among other provisions) to play the entire video of defendant's interview with the detective. The trial court denied this motion, but instead redacted the video to remove matters the court deemed irrelevant, unduly prejudicial, or time-wasting. Defense counsel used the redacted video in cross-examining Detective Bayer-Evans.

DISCUSSION

I

Defendant contends: "The trial court prejudicially erred when it denied [defendant]'s request to admit into evidence the entire recording of his interview by Detective Bayer-Evans; in light of the evidence about that interview introduced by the prosecution, the rule of completeness (Evidence Code section 356) entitled [defendant] to put the entire interview before the jury." We conclude defendant has failed to show the

5

court abused its discretion by redacting the video before showing it to the jury, and therefore do not reach his claim of prejudice.

Background

*Preliminary Discussions*

Before trial, the prosecution moved in limine to prohibit the defense from introducing statements made by defendant to the police, including "a Mirandized statement to Detective Bayer-Evans." The motion asserted that if defendant testified, his statements would come in on rebuttal.

Defense counsel argued orally that all of defendant's statements should come in if any did, based on "the rule of completeness." The trial court granted the prosecutor's motion, but without prejudice to revisiting the issue if defense counsel could flesh out her argument.

During the defense case, while defendant was testifying on redirect examination about the substance of his statements to the police, defense counsel asked to approach the bench.

Outside the jury's presence, the trial court stated that defense counsel had "indicated a desire to play portions of a recording of an interview of the defendant as a prior consistent statement." Defense counsel clarified that she wanted the jury to hear the entire audio- and video-recorded interview with the detective. The prosecutor said she had not yet impeached defendant as to his statements, but had merely asked him if he made them; therefore, to introduce them now as prior consistent statements would be improper. Defense counsel replied that because the prosecutor had brought up all of the statements, the rule of completeness authorized their admission in full.

The prosecutor asserted that she had not known defendant would testify, but once he did, all his statements were "fair game" for questioning; however, that did not entitle him both to testify and to have his entire recorded video shown on direct examination. The trial court still did not know why the rule of completeness would make the entire

6

video admissible at this stage, but invited defense counsel to make a fuller argument on the issue. Counsel indicated she would have to look further into it, including watching the video again, but the issue would return in any event once the prosecutor called the officers to testify. The prosecutor stated that she would be calling Detective Bayer-Evans.

The prosecutor subsequently called the detective, who gave the testimony described above on direct examination.

*Defendant's Motion*

After Detective Bayer-Evans testified on direct, defendant moved to admit the complete recorded interview of defendant. According to the motion, "[t]he witness characterized [defendant] as ' "evasive" ' throughout the interview. She said he wasn't forthcoming. She characterized his initial part of the interview as nonchalant, tired, disinterested/disconnected and without concern for Ryan. She described three distinct ' "stories" ' [defendant] told about the stabbing: (1) Ryan fell on the knife; (2) [defendant] had his arms up; and (3) when punches were thrown. She described him getting tense, agitated, and angry when talking about Ursula. She admitted that the interview was audio and video recorded." Defendant sought to introduce the entire video on six different theories: section 356; section 791 (rehabilitation with previous consistent statements); section 1236 (prior consistent statement); section 1250 (state of mind); section 352 (relevance); and impeachment.[2]

Acknowledging that section 356 allows the admission of only those portions of a statement that are relevant to the inquiry, defendant asserted that by calling defendant's statement evasive and by opining on his truthfulness and demeanor, the detective had put

---

[2]    Since defendant argues only section 356 on appeal, we discuss the remaining theories of admissibility further only so far as they overlap with the "completeness" argument.

7

the entire statement at issue. Even points not raised during direct examination of the detective were relevant: when defendant was asked a question and answered it, that rebutted the claim he was evasive, and the jury should be allowed to decide whether he was truthful and forthright without being improperly swayed by the detective's lay opinion. Furthermore, since the entire statement was "on the subject of the stabbing—what [led] up to it, how it occurred, what happened directly after"—no part of it was "off topic."

The entire interview was also relevant "to show impeachment [of the detective] by omission." Watching the video, defense counsel could not find what the detective called defendant's "three versions of events": although defendant "may describe the incident using different words in different ways, . . . he does not change his story." If the jury saw only part of the interview, they might conclude they were not being shown the part where defendant changed his story.

Finally, nothing in the interview was prejudicial to the prosecution case. The fact that defendant repeatedly called the stabbing accidental was a point that he and three officers had already testified to. Any part of the video that might contain opinion or speculation could be dealt with by a limiting instruction.

*Argument and Ruling on the Motion*

Defense counsel argued: "[T]he detective has basically just testified to the whole statement without context, and she's been testifying to his demeanor, changing stories. [¶] Although I've been trying to go through this transcript and can't find exactly what she's talking about, . . . I think the jury needs to see the video because he's actually pretty consistent in his statements where he's trying to figure out how this happened, and she's characterizing it as if he's not telling her what's happening, but their whole back and forth is about he keeps saying Ryan lunged at me. We tussled. [¶] Same thing we have been hearing between the restroom and the TV center and the bed, and this detective is sort of characterizing it differently. [T]he video is the best evidence under the best

8

evidence rule, I think at this point the rule of completeness does come in because she's testified to so many different things and lack of things [*sic*], and I think the jury needs to see the video. They are the ones that should be judging what [*sic*] [defendant] is telling the truth, not this witness. I think if she's talking about demeanor and his actions, they need to see his demeanor that day in context, so I would request to play the video."

The prosecutor responded: "I asked the detective specific things based on [defendant]'s testimony to impeach certain things that he said. That was certainly not the entire one-hour[-]long video . . . . They were very pointed things. Particularly how Ryan got stabbed, that was mainly what I was asking her about[,] and when he saw blood[,] because that was what he testified to. [¶] There were a plethora of other things that went on throughout this interview that I did not touch [on]. A lot of the audio recording is self-serving hearsay statements that the defendant likely wants the jury to hear which is him constantly saying [']I would never try to stab my brother. I loved him. This was an accident.['] Things of that nature are all throughout this video that are hearsay, and not even in the realm of what I was talking to the detective about on my redirect based on impeaching [defendant]. [¶] The detective is certainly within her realm as a testifying witness to give a lay opinion as to someone's demeanor just like all of the other witnesses did without audio or video recording. She is allowed to say how someone appeared to her, also how someone's demeanor was without having a video put on because the defense . . . thinks the jury should see that. [¶] It's still self-serving video. That would take up an undue amount of time, and still doesn't address the questions that I asked the witness on the stand. Her main purpose for coming back was to impeach a select few things that [defendant] said, not the entirety of the video."

Defense counsel responded: "She's testified to each time talking about how the stabbing occurred, and that is throughout this whole video. . . . [S]he's narrowed it down to three times as if there is only three things he said about that. [¶] She's brought up how he was when talking about Ursula. She's brought up how he was [in the] beginning,

9

middle and end of the video which is the whole thing demeanor[-]wise. I can go through and come back with 20 different cuts of every single part that she's talked about, but at that point it's better to just completely play the video, and . . . clips of this video aren't going to give the jury the whole picture about [the detective's characterization of defendant's demeanor]."

The trial court, which had not yet seen the video, said it was "toying with the idea of a 402 . . . although I really regret the idea of having a whole hour of watching it, and then having a whole other hour of potentially playing it to the jury." The court deferred ruling on the motion.

The next morning, defense counsel renewed her request to play the entire video. Counsel asserted that if they played it "in 34 clips," the jury would wonder whether the 35th clip would have shown something they did not see.

The prosecutor responded that substantial parts of the video were not admissible under section 356 because they were irrelevant, speculative, or prejudicial.

The prosecutor asserted that the video included self-serving statements by defendant already ruled inadmissible, and the parts which involved subjects the prosecutor had not asked the detective about were irrelevant to the "rule of completeness," as was the detective's perception of defendant's demeanor.

According to the prosecutor, during much of the interview the detective asked hypothetical questions, set up hypothetical scenarios, and inquired into defendant's state of mind during the crime, partly as a victim-blaming interrogation technique. The detective also spent substantial time on the question of what happened to defendant's knife (a topic not raised on direct examination of the detective); defendant implicated his friends in the knife's disappearance and offered to take a lie detector test on the topic, which was both irrelevant and prejudicial to the prosecution.

The prosecutor asserted that so far as the video showed defendant acting emotional about the stabbing, it would improperly evoke sympathy for him without contradicting or

10

explaining or providing context for anything the detective had testified to. So too would his statements about needing to get home to his children and being the sole source of income in the home.

According to the prosecutor, the detective did not testify (as defense counsel had claimed) that there were three distinct moments in the interview when defendant changed his story, but rather that he had provided three different versions of how Ryan got stabbed, spaced throughout the interview.

The trial court, which had still not viewed the video, noted that the prosecutor's argument had inclined the court toward "only allowing clips." The court proposed going through the video with counsel to see if they could jointly work out redactions.

After the trial court called in and excused the jury, the court and counsel went roughly halfway through the video. The court then announced that it would review the rest of the transcript and the video on its own and tentatively rule on admissibility.

The next day, the trial court explained that it had highlighted passages in the transcript corresponding to the parts of the video the court deemed inadmissible. After giving counsel the opportunity to do likewise (acknowledging that defense counsel still wanted the whole video admitted), the court stated:

"[W]hen I made these highlightings on the transcripts, I already had a sense that I was inclined to allow things in from this . . . recording if they tended to show defendant's responsiveness to questions about the incident. . . . [T]o the extent that the detective characterized the defendant's demeanor or responsiveness during the interview as changing his story, as evasive, . . . sounding like he wasn't being completely forthright, he wasn't telling the whole story, he was giving different versions of it and not being responsive, that I thought questioning . . . that would show his responsiveness seemed like fair game, so I tried to leave those in.

"What I did take out in my tentative markup were things that tended to show subjects that were not discussed by the detective in her testimony, specifically the knife

11

and where the knife was and perhaps some other things . . . that didn't seem inconsistent with the detective's testimony.

"For example, she testified that [defendant] became agitated or angry when talking about Ursula and [the victim] and whatever [there] might be between them, and so I marked that portion to come out because it didn't seem inconsistent, and the parts that the People have argued . . . about the detective using interview techniques . . .—there is a couple of different techniques that I could discern.

"One is essentially saying I know . . . that you didn't intentionally stab him, I just want to know what happened, and I'm not saying you stabbed him, and I know you didn't mean it or whatever kind of version where she is sort of siding with him to get him to talk, I just didn't think that was probative of his being responsive or not, and it may have been confusing. I thought it would come out as 352 at the very least, and then there is a part where she talks about what [the prosecutor] called victim blaming where she is kind of saying, you know, to [defendant], [the victim] is coming at you, and he's bigger than you, and things that again seem like not what she really means, not necessarily what she really thinks, and her opinions and thoughts about what happened aren't even really relevant because she wasn't there, and it's an interview technique that doesn't tend to show—at least primarily show the defendant's responsiveness, and that there is plenty of other stuff where it's basically question and answer where his repressiveness [*sic*], his evasiven[e]ss or whether he's changing his story can be ga[u]ged, so I tried to leave that sort of stuff in and take out where she is using the interview techniques.

"And then there were some other things that got to be sort of . . . 352 where she's talking about what would you say to [the victim]? What would he say to you? Speculation, again, an interview technique. . . ."

Defense counsel reiterated that showing only selected clips would leave the jury wondering about what had been left out. The trial court found it unhelpful to speculate about what the jury might think. The court then stated, "The stuff you are asking to have

12

in addition is unduly prejudicial, confusing, not tending to show the things that I think maybe you are entitled to show."

The trial court added:  "Most of this is very self-serving inadmissible hearsay that shouldn't come in at all, and it's only because the detective to some degree characterized her opinion of his demeanor that I think you are right that the jury should get to see his demeanor. . . .  [T]o the extent there is anything that's incomplete, it's going to make it a lot more complete.  It's not like the kind of thing where . . . counsel provides half of a statement and leaves out the rest that would explain its meaning, it's nowhere near that clear, but I think it answers the completeness issue."

The trial court and counsel then went over the court's proposed redactions in minute detail, and the court made further edits in response to counsel's suggestions.

*The Presentation of the Edited Video*

On the next court day, the trial court stated outside the jury's presence that the edited version of the video, which counsel acknowledged they had reviewed and approved, would be presented.

After the jury was brought in, defense counsel cross-examined Detective Bayer-Evans, using the edited video step by step.  The detective insisted she had not mischaracterized or misrepresented the interview in any way.

The prosecutor on redirect questioned the detective about interviewing techniques, allowing her to explain that much of her questioning was designed to get defendant to talk freely about the incident and did not reflect her own beliefs about what had happened.

*Analysis*

Defendant insists the trial court erred under section 356 by refusing to play the entire video, and the error was prejudicial.  We disagree with defendant's first premise.  Because we find section 356 did not require the court to play the video without redaction, we do not reach defendant's claim of prejudice.

13

Section 356 states:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

Section 356, sometimes called the "rule of completeness," is intended to prevent a party from creating a misleading impression on a given topic by using only selected aspects of a conversation, act, declaration, or writing pertaining to that topic.  (*People v. Brooks* (2017) 3 Cal.5th 1, 49.)  The statute "applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced.  [Citation.]  Statements pertaining to other matters may be excluded."  (*People v. Samuels* (2005) 36 Cal.4th 96, 130; accord, *People v. Chism* (2014) 58 Cal.4th 1266, 1324)  The evidentiary rules that irrelevant evidence is inadmissible (§ 350), and unduly prejudicial, confusing, or time-wasting evidence may be excluded even if arguably relevant (§ 352), apply to evidence proffered under section 356.  (*People v. Farley* (2009) 46 Cal.4th 1053, 1103; *Benson v. Honda Motor Co.* (1994) 26 Cal.App.4th 1337, 1349-1350.)

We review a trial court's ruling under section 356 for abuse of discretion, and will not disturb the court's exercise of that discretion unless it was done in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; *People v. Jordan* (1986) 42 Cal.3d 308, 316 [rulings made in exercise of discretion statutorily vested in trial court].)  We find no such abuse here.

Our ability to review this issue is limited because the record does not include either the original video or the redacted version shown to the jury.[3] We have the original and edited versions of the transcript and their accuracy is not in dispute. But defendant's chief argument below and on appeal—that only the complete video could prove the detective had mischaracterized defendant's demeanor—cannot be resolved from the transcripts alone. Therefore, we cannot find that it was an abuse of discretion for the trial court to decide, after viewing the entire video, that an edited version would satisfy the purpose of section 356 on this point.

So far as we can review defendant's contention based on the original and redacted versions of the transcripts, we reach the same conclusion.

After spending a great deal of time and effort (on its own and with counsel's assistance) in inspecting the video literally minute by minute, the trial court came up with clear criteria for determining which parts were admissible under section 356. As to matters other than defendant's demeanor, the court reasoned, in summary: So far as the video showed defendant talking about matters as to which the detective testified that his story changed or shifted, the video was admissible to allow the jury to assess the veracity of that testimony; but if selected portions of the video would serve that purpose, as the court found, showing the entire video was unnecessary to satisfy the "rule of completeness" in this respect. On the other hand, admitting those portions of the video in which defendant was merely seeking to gain sympathy would not have served the purpose behind section 356—to prevent a party from creating a misleading impression (*People v. Brooks, supra*, 3 Cal.5th at p. 59)—and could have created undue prejudice or confusion. Similarly, the jury could have been confused by those portions of the video in

---

[3]    The record before us does not reflect a request by defendant to make the two versions of the video part of the appellate record, and defendant does not mention any such request in his briefs.

which the detective, while using "victim-blaming" interrogation techniques, falsely implied that she thought any of her speculative hypotheticals might be true. Finally, parts of the video which were consistent with the detective's testimony as to matters of fact could properly be excluded under section 352 as unnecessarily time-consuming.

Adhering to these criteria, the trial court made the following redactions in the 42-page transcript (summarized to save space):

At page 8, the court deleted 11 lines in which the detective and defendant discuss what the victim might say or think about the incident.

At page 13, the court deleted five and one-half lines in which the detective speculates about how the stabbing might have happened in a way that minimizes the gravity of defendant's acts.

At page 14, the court deleted five lines in which the detective asks defendant what he would do differently if he had it to do over.

At page 15, the court deleted 11 and one-half lines in which the detective talks about hearing both sides of the story.

At page 19, the court deleted a full page where the detective gives speculative scenarios sympathetic to defendant, followed by eight lines at the top of page 20 where the detective talks about the victim's impending surgery and asks defendant what he would say to the victim if he could say only one thing.

At the end of page 20 and continuing onto page 21, the court deleted 15 lines in which the detective offers further speculative scenarios of the crime.

At the end of page 21 and continuing through the top of page 25, the court deleted around four and one-half pages in which the detective and defendant speculate about what happened to defendant's knife.

At the end of page 25 and continuing onto page 26, the court deleted 12 lines in which the detective comes up with yet another speculative scenario of the crime.

16

At page 27, the court deleted a line and one-half in which the detective asks defendant what he thought about the victim attacking him and defendant responds: "He's trippin'."

At pages 31 through 33, the court deleted most of three pages in which defendant makes statements designed to evoke sympathy, continues to deny that he intended to stab the victim, and describes his purported thoughts at the time, while the detective spells out another speculative scenario indicating a momentary loss of control during an incident of self-defense or mutual combat.

At page 35, the court deleted six and one-half lines in which the detective tells defendant that a rib fracture caused by slamming into something differs from one caused by a punch.

At pages 36 through 38, the court deleted the end of page 36, the whole of page 37, and the first five lines of page 38, in which the detective talks about going to see the victim and speculates about what he might say.

Finally, at pages 39 through 42, the court deleted everything from the bottom of page 39 to the end, in which the detective asks defendant what he thinks the victim would be thinking and feeling now, whether defendant wants to write an apology letter to the victim, and how defendant feels toward the victim.

All of these redactions were consistent with the trial court's stated criteria for exclusion. Furthermore, in the 27 pages of the redacted transcript, there is more than enough evidence for the jury to assess the validity of the detective's characterizations of defendant's veracity and demeanor.

Defendant does not criticize any of the trial court's redactions in particular. Instead, he asserts that the court's concerns about certain kinds of evidence could have been dealt with in ways other than redacting the video. However, the possibility that the court could have exercised its discretion differently does not show that the way the court exercised its discretion was arbitrary, capricious, or patently absurd. (Cf. *People v.*

17

*Rodrigues, supra*, 8 Cal.4th at pp. 1124-1125; *People v. Jordan, supra*, 42 Cal.3d at p. 316; *People v. Parrish, supra*, 152 Cal.App.4th at p. 274.)

Defendant also asserts that "to the extent" the court based any of its decisions on the hearsay rule, the court erred. (Cf. *People v. Williams* (1975) 13 Cal.3d 559, 565 [hearsay rule does not limit admissibility under § 356].) But the record shows the court did not do so. On the contrary, immediately after speaking of "very self-serving inadmissible hearsay that shouldn't come in at all," (the phrase on which defendant relies) the court stated that because the detective had testified about defendant's demeanor, much of that "inadmissible hearsay" was admissible under section 356.

Lastly, defendant cites a few decisions which are easily distinguished. Aside from *People v. Murphy* (1870) 39 Cal. 52, a pre-Evidence Code case that states the principle underlying the future section 356 in bare bones fashion, defendant relies mainly on *People v. Clark* (2016) 63 Cal.4th 522 and *People v. Hamilton* (1989) 48 Cal.3d 1142. In both *Clark* and *Hamilton*, the evidence at issue was offered by the prosecution and admitted in full over defense's objection pursuant to section 356. Thus, the reviewing courts in both cases implicitly applied the deferential abuse-of-discretion standard to the trial court's rulings admitting the proffered evidence in full, as we must also do where the trial court exercised its discretion to exclude part of the proffered evidence. (*Clark*, at pp. 599-600; *Hamilton*, at pp. 1173-1174.) Furthermore, in *Hamilton* the defense objected only on the ground that the full tape recording of a statement proffered by the prosecution was not "part of the same subject" as the portion of the statement the defendant had introduced (*Hamilton*, at pp. 1173-1174), and in *Clark* the defense objected to the admission of tapes only on the ground of hearsay (*Clark*, at pp. 599-600). But in the instant case, the prosecutor raised objections going to relevance (§ 350) and undue prejudice, confusion, or waste of time (§ 352), and the court's redactions were based on both standards. Because the courts in *Clark* and *Hamilton* had no occasion to consider such objections, those decisions do not assist defendant.

18

Defendant does not argue that some redaction might have been acceptable, but the redaction done by the trial court was not. He argues only that section 356 required the showing of the video in its entirety. In other words, he must show that any redaction whatever amounted to an abuse of discretion. He fails to meet that burden.

Since the trial court did not err by redacting the video, we do not consider defendant's claim that the court's purported error was prejudicial.

II

Defendant contends the trial court abused its discretion by imposing the GBI enhancement instead of staying it. We disagree.

*Background*

The probation report found defendant was statutorily ineligible for probation absent unusual circumstances, of which there were none; but even if unusual circumstances had existed, state prison would still be recommended due to the nature, seriousness and circumstances of the crime as compared to other instances of the same crime. The report recommended the low term of two years on count 1 because defendant had no prior record (Cal. Rules of Court, rule 4.423(b)(1)), plus a three-year term on the GBI enhancement.

Defendant did not submit a statement. However, his mother and several friends and acquaintances wrote statements attesting to his good character, his stable employment history, his involvement in his children's lives, his participation in church activities, and his constructive role in the community.

At the sentencing hearing, the victim's mother made a statement, noting that when the victim committed a crime in 2009 she had turned him in herself, but defendant had been able to walk around free for an entire year, "partially by lying," and that the victim was lucky to escape with his life.

Defense counsel argued for the most lenient possible sentence. She asserted defendant had lived for 40 years without even a traffic ticket until now. This case began

19

as self-defense, with defendant attacked in his own house, but he simply used too much force. The case had broken up longstanding friendships and families; it had been hard on everyone, including defendant's children, Ursula (with whom he coparented despite their separation), and the victim, and would continue to have an impact on defendant and his family. Defendant was living in Oakland to get away from the situation with the victim and other bad things that had been going on in Sacramento. Counsel had advised him not to give a statement to the probation officer. Notwithstanding the probation report, the trial court should find that unusual circumstances existed to stay the GBI enhancement, and grant probation with an ankle monitor.

Defendant apologized and said he was not trying to hurt his friend.

The prosecutor argued for the midterm sentence on count 1 plus imposition of the GBI enhancement. The People had offered a five-year term to defendant, but he refused it, claiming he was not in the wrong and the stabbing was accidental. Defendant was less than honest from the beginning and continued to be so on the stand, blaming the victim, who was lucky not to have been killed.

The trial court ruled:

"[T]his is a difficult case. Sentencing for a judge is one of the hardest things because a judge is asked to essentially to predict the future behavior of someone who's been found guilty or who admits guilt, and [defense counsel] has a point. This is a person who has not been in trouble before. He has all sorts of letters in support that shows very admirable personal characteristics. He has loving children. He takes good care of them. And so I think that is part of this picture.

"However, I do agree with the People that this is a very serious crime, and that great bodily injury occurred, and as the victim's mother has attested, it could have been worse. But even as it resulted, [the victim] testified that he is still in the process of recovering a year later, and having a broken rib and having a punctured lung and other stab wounds is certainly great bodily injury.

20

"The defendant is ineligible for probation unless I were to find unusual circumstances, and I do not in this case find unusual circumstances. But even if I did, I would not grant probation because of the seriousness of the crime, the great bodily injury. I don't believe that [defendant] didn't realize he had a knife in his hand. I don't believe that he, who is so well trained [in] martial arts, accidentally stabbed [the victim] four times.

"I understand that there was anger involved. I understand that [the victim] was provocative, and I understand that self-defense in your own home is viable as a concept, but that I do also find that the response was unreasonable, too violent and that [defendant], in an attempt to evade the responsibility, was not completely forthcoming, was vague, was evasive, was telling half truths both to law enforcement and on the stand, and that the jury so concluded given the result.

"So I will impose prison time. The People have asked for mid term which would be three years plus the GBI which would be another three for six. In view of [defendant]'s lack of any record, I am going to go with the probation recommendation of low term of two years plus the GBI for three for a total of five years in State Prison."

Defense counsel asked about staying the GBI "given his lack of record." The trial court replied: "I did consider it. I don't think it's the thing to do in this case. It's an extremely serious attack."

*Analysis*

Under Penal Code section 1385, subdivision (c)(1), a trial court acting in furtherance of justice may strike or dismiss an enhancement, or may strike the additional punishment for the enhancement. (*In re Pacheco* (2007) 155 Cal.App.4th 1439, 1444.) We review the court's decision not to grant either form of relief under the abuse of discretion standard. (See *People v. Williams* (1998) 17 Cal.4th 148, 158.)

The trial court here understood its discretion and chose not to grant the requested relief because it found that defendant's conduct in inflicting GBI constituted "an

21

extremely serious attack." In other words, the court impliedly found that defendant's infliction of GBI was more serious than in the typical case where the enhancement is imposed. That finding was correct.

An injury sufficient to constitute GBI (that is, a significant or substantial injury) may be transitory and not permanent or protracted. (Pen. Code, § 12202.7, subd. (f); *People v. Escobar* (1992) 3 Cal.4th 740, 748-749.) It may not even require medical treatment. (See *People v. Cross* (2008) 45 Cal.4th 58, 66 [severity of injury, resulting pain, *or* medical care required]); *People v. Wade* (2012) 204 Cal.App.4th 1142, 1149-1150 [loss of consciousness not requiring medical care].) A "fine line" can divide the level of injury sufficient to constitute GBI from that which does not quite do so. (*Escobar,* at p. 752, and cases cited therein.)

But here, the victim's injuries were protracted, severe, painful, and potentially life-threatening; he had still not fully recovered from them at the time of trial. Whatever he did at the start of the incident, and whatever grounds defendant had for using force in response, pale in comparison to the repeated stabbings defendant inflicted on the victim—especially in light of defendant's martial arts skills, not matched by the victim, which might have enabled him to stymie the victim without using a weapon. Whatever fine line divides GBI from injury, which is not quite such, defendant left that line far behind.

Furthermore, as the trial court pointed out, based on the facts found by the jury defendant was dishonest about his conduct from beginning to end. And his long friendship with the victim, if anything, counted against him: the victim could not have anticipated defendant's potentially lethal onslaught, and defendant's professed love and concern for the victim never drove him to admit the truth.

For all of these reasons, the trial court was well within its discretion to find it would not further justice to spare defendant the usual consequences for inflicting GBI.

Defendant asserts that when the trial court called defendant's conduct "an

extremely serious attack," the court mischaracterized it because it was the victim who attacked defendant in the first place. However, defendant cites no authority for the proposition that self-defense may not turn into an attack when the defender uses more force than is necessary to repel the attack, as defendant did (even by his counsel's admission).

Defendant's remaining arguments, which simply repeat trial counsel's arguments for leniency, show at most that the trial court could have exercised its discretion differently. They do not show that the court abused its discretion by making the decision it did.

### DISPOSITION

The judgment is affirmed.

/s/
BLEASE, Acting P. J.

We concur:


/s/
MURRAY, J.


/s/
DUARTE, J.